MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:    2014 ME 47
Docket:      Lin-12-592
Argued:      November 21, 2013
Decided:     March 25, 2014

Panel:       SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.


## STATE OF MAINE

v.

## ELFIDO MARROQUIN-ALDANA

SILVER, J.

[¶1]  Elfido Marroquin-Aldana appeals from a judgment of conviction of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2013), entered in the trial court (*Hjelm, J.*) after a jury trial.  Marroquin-Aldana argues that the court erred or abused its discretion in denying Marroquin-Aldana access to immigration records pertaining to the victim's mother, in denying Marroquin-Aldana's motions to continue the trial, in finding the minor victim competent to testify at trial, and in failing to provide adequate interpretation services at trial.  We focus on the immigration records and interpretation issues and affirm the judgment.

2

## I. BACKGROUND

A.    Factual Background

[¶2]  The following facts are drawn from the trial record, viewed in the light most favorable to the State.  *State v. Mercier*, 2014 ME 28, ¶ 2, --- A.3d ---.  In 2002, the victim's mother, Lissette, accepted employment as a housekeeper for the victim's father, Joseph, who is a dentist.  Lissette and her son Joshua moved into Joseph's Maine home.  Eventually, Lissette and Joseph's relationship became romantic, and they were married in 2005.  The victim was born in 2006.

[¶3]  In 2011, Lissette met a woman named Carolina to discuss possible employment in Lissette and Joseph's home.  Lissette and Joseph interviewed Carolina at her home in Massachusetts, where they also met Carolina's longtime partner, Marroquin-Aldana.[1]  As a result of that meeting, Carolina came to stay with the victim's family as a housekeeper in early May 2011.

[¶4]  At the time of Carolina's arrival, work was being done on the family's home and the family was living in a building that also housed Joseph's dental office.  During this period, Marroquin-Aldana made at least one trip to Maine.  On one such occasion, Marroquin-Aldana's car broke down and he stayed at least one

---

[1]   In their testimony, Lissette and Joseph referred to Marroquin-Aldana as Carolina's husband. Carolina testified that although she referred to Marroquin-Aldana as her husband, they were not married.

night with the family and Carolina in the office building.[2]  By June 2011, the family had moved back into their home, and Marroquin-Aldana had moved in with them.  Marroquin-Aldana and Carolina stayed in a third-floor bedroom with no bathroom of its own.  They showered in a bathroom on the second floor, which was connected to Lissette's and the victim's bedrooms.

[¶5]  The victim testified that while she and her family were still staying in the office building, Marroquin-Aldana[3] put his "private part" in her "private part."[4] The victim testified that this occurred in her bedroom while Carolina was doing laundry in the next room.  The victim also testified that Marroquin-Aldana assaulted her on two occasions in the family home.  In one instance, Marroquin-Aldana put his "private part" in her mouth in the bathroom connected to her room.  In the other instance, Marroquin-Aldana put his "private part" in her "private part" in Carolina and Marroquin-Aldana's bedroom.

[¶6]  On June 22, 2011, Marroquin-Aldana and Carolina took Joshua and the victim to see a movie while Lissette was out with a friend.  When Lissette returned

---

[2]  There was conflicting testimony as to the amount of time Marroquin-Aldana stayed with the family in the office building in May 2011.  Lissette testified that Marroquin-Aldana stayed with them for a week. Joseph testified that Marroquin-Aldana stayed two to three days.  Carolina testified that Marroquin-Aldana stayed a single night.

[3]  The victim was unable to identify Marroquin-Aldana at trial but testified that he was married to Carolina and was living in her house at the time of the assaults.  Other witnesses identified Marroquin-Aldana and noted that his appearance had changed since the summer of 2011.

[4]  The victim identified a "private part" as "[w]here you pee."

4

home that night, she found the victim asleep in Lissette's bed,[5] still wearing the clothes that she had worn that day. Lissette then changed the victim into her pajamas. As she was removing the victim's shorts and underwear, Lissette observed a dark stain on the victim's underwear and discharge from the victim's vagina, which she described as looking "like dead blood." Lissette cleaned off the discharge using the victim's shorts. Lissette learned through an internet search that the discharge could be an infection or a sign of sexual abuse. She then rolled up the victim's underwear and shorts and put them in her bedside table. Lissette spoke to Carolina about the discharge, and Carolina said she had never seen anything like that. Lissette did not talk to the victim or Joseph about the incident at that time.

[¶7] Several days later,[6] while watching a movie with Lissette in Lissette's bedroom, the victim told Lissette that her "private part" hurt. Lissette asked whether someone had touched her private part; the victim said yes, and told her who it was. The victim then told Lissette that "he put it in my mouth." Lissette asked what it looked like, at which point the victim drew a picture that was later admitted in evidence. The victim identified the picture as a drawing of Marroquin-Aldana's "private part."

---

[5] The victim regularly slept in Lissette's bed.

[6] Lissette testified that she left the house without the victim twice during this period: once for forty to forty-five minutes to visit friends, and again for three to four hours to buy mulch.

[¶8] Lissette informed Joseph of what had happened, and the next day they confronted Marroquin-Aldana and accused him of assaulting the victim. Marroquin-Aldana denied it. Lissette and Joseph asked Marroquin-Aldana to leave, and he and Carolina moved out. Marroquin-Aldana and Carolina later gave Lissette and Joseph an address in Chicago where they could be reached so that Lissette and Joseph could send them the title to a car.

[¶9] Lissette and Joseph did not immediately call the police in part because Lissette was concerned that she might be deported if she involved the authorities. Lissette, born in Guatemala, arrived in the United States in 1992 as a legal immigrant with a work permit and Social Security number. In 2002 or 2003, Lissette was ordered to return to Guatemala. Lissette testified that she had hired an immigration attorney but represented herself at the hearing before an immigration court. She hired another attorney and unsuccessfully pursued an appeal. She received a final deportation notice in 2003, which she ignored.[7] Lissette testified that, in June 2011, she was facing the same immigration issues that she had faced for the past nine years, and denied receiving any communications from immigration authorities that year. On July 21, 2011, after the confrontation with Marroquin-Aldana, Lissette again consulted an immigration attorney.

---

[7] Lissette testified that, before marrying Joseph, she had been in an abusive relationship with the father of her son, Joshua. Lissette had ultimately pressed charges against Joshua's father, and he had been deported to El Salvador. Lissette testified that she "couldn't go back home" to Guatemala because Joshua's father had told her that he would "find" her.

6

[¶10] Marroquin-Aldana repeatedly called Lissette and Joseph regarding the title to the car, and on July 25, 2011, called Lissette names and said that they had nothing on him and could not prove anything. Lissette became convinced that they needed to call the authorities, which Joseph did the next day. Later, in February 2012, Lissette filed an application for a "U visa" based on her participation in Marroquin-Aldana's prosecution.[8] Lissette testified that she believes that obtaining a U visa would solve her immigration issues, but maintained that she did not know that U visas were available until after she called the police.

[¶11] Lissette put the shorts and underwear that she had kept in the bedside table into a plastic bag and gave the bag to the police. She also gave the police several tissues that she had found while cleaning Marroquin-Aldana and Carolina's old room and had stored in a sealed plastic bag in her bureau. The tissues appeared to Lissette to have been used by someone "cleaning themselves," and Lissette thought that they might help "identify somehow."

---

[8] Federal law permits aliens who are the victims of certain serious crimes, including sexual assault, and who assist law enforcement in investigating and prosecuting those crimes to apply for a temporary "U visa." *See* 8 U.S.C. §§ 1101(a)(15)(U), 1184(p), 1255(m) (West, Westlaw through P.L. 113-74 approved 1-16-14). *See generally Catholic Charities CYO v. Chertoff*, 622 F. Supp. 2d 865, 870-74 (N.D. Cal. 2008) (providing history and overview of U visa process). U visa status lasts for four years, but an alien who has been present in the United States on a U visa for three years may apply for permanent residence. *See* 8 U.S.C. §§ 1184(p)(6), 1255(m)(1).

[¶12]   The Maine State Police Crime Lab analyzed the items that Lissette had provided.   A screening test on a stain on the victim's shorts was weakly positive for blood and semen, but further testing was unable to confirm the presence of human blood, and not enough sperm cells were present to perform DNA testing.  The stain was soaked into the fabric and therefore appeared to have been applied wet.  There were no transfer marks to indicate that the stain had been applied via a wiping motion, as Lissette had described, but the forensic chemist testified that the absence of such marks could be consistent with a dabbing or blotting motion.

[¶13]   A stain on the victim's underwear tested positive for blood and semen, and again appeared to have been applied wet because it had soaked into the fabric.  A differential DNA analysis was performed on the stains on the victim's underwear and on the tissues found in Marroquin-Aldana and Carolina's room. This process separates DNA profiles originating from sperm cells from those originating from non-sperm cells.  The non-sperm portion of the sample from the underwear matched the victim's known DNA profile.  Marroquin-Aldana was included as a donor to the sperm portion of that sample.[9]  Marroquin-Aldana and Carolina were included as potential donors to the non-sperm portion of the sample

---

[9]   The sperm portion was a mixture of DNA profiles from at least two individuals.   The forensic analyst testified that differential DNA extraction is not one hundred percent efficient, meaning that residual non-sperm cells could end up in the sperm portion, and vice versa.

8

from the tissues,[10] and the victim and Lissette were excluded. The sperm portion matched Marroquin-Aldana's known DNA profile.

[¶14] A physical examination of the victim performed on August 8, 2011, was nonspecific and revealed no signs of injury. The examiner testified at trial, however, that sexual abuse would not necessarily have caused injury, and that even if it had caused injury, such injury could have healed by the time of the examination.

[¶15] At the behest of the Lincoln County Sheriff's Department, Chicago police visited the address that Marroquin-Aldana and Carolina had given Lissette and Joseph, in order to confirm that Marroquin-Aldana was living there. Carolina answered the door, and the officers asked to speak with Marroquin-Aldana. As a ruse to stall for time until an arrest warrant could be issued, the officers told Marroquin-Aldana that they were investigating his vehicle and asked to see the car. After Marroquin-Aldana showed the officers the car, he spontaneously told them that an incident had occurred in Maine in which he had exited the bathroom while wearing a towel around his waist and his employer's daughter was in the

---

[10] DNA analysis was only performed on one of the three tissues.

bedroom.[11] He also said that "the girl was fond of him." A warrant issued soon thereafter, and Marroquin-Aldana was taken into custody.

B.    Procedural History

[¶16] On November 18, 2011, Marroquin-Aldana was indicted for unlawful sexual contact (Class A), 17-A M.R.S. § 255-A(1)(F-1) (2013), and gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2013).[12] Marroquin-Aldana filed a motion for a speedy trial, which the court granted on January 27, 2012.[13]

[¶17] Marroquin-Aldana made several attempts prior to trial to obtain Lissette's immigration records. First, Marroquin-Aldana served a subpoena on

---

[11] Carolina testified at trial that an incident occurred in which Marroquin-Aldana was wearing a towel after coming out of the shower and the towel fell off. She testified that Marroquin-Aldana ran to their bedroom, and that she was not sure if "anybody was there." She further testified that there was another incident in which the victim came into the bathroom while Marroquin-Aldana was in the shower and Carolina was combing her hair in front of the mirror.

[12] The indictment was amended on the State's motion in March 2012.

[13] Marroquin-Aldana vigorously defended the charges. He filed numerous pretrial motions, including a motion for preservation of DNA evidence, a motion to compel discovery relating to the State's forensic evidence, a motion to suppress statements, a motion to compel production of any Department of Health and Human Services records relating to the victim, a motion seeking a court order that a court reporter be present at grand jury proceedings in the event that the State sought a superseding indictment, a motion for a hearing concerning the victim's competence to testify, a motion to compel production of the victim's counseling records, a motion to exclude the State's forensic evidence due to chain-of-custody issues, a discovery motion seeking to allow Marroquin-Aldana's expert to independently examine the forensic evidence, a motion to compel production of the victim's school records, a motion to compel production of the victim's medical records, a motion for a pretrial "taint" hearing regarding allegedly suggestive interview and counseling techniques, and a motion in limine on evidentiary issues. The parties also litigated the issue of whether certain investigative reports concerning an investigating officer and an employee of the Maine State Police Crime Laboratory should be disclosed to the parties and admissible at trial.

10

Lissette and filed a motion in limine pursuant to M.R. Crim. P. 17(d),[14] which sets forth the appropriate procedure where "a party or its attorney knows that a subpoena seeks the production of documentary evidence that may be protected from disclosure by a privilege, confidentiality protection or privacy protection under federal law, Maine law or the Maine Rules of Evidence." At a hearing on the issue on April 27, 2012, Marroquin-Aldana argued that the records were necessary to establish Lissette's motive to fabricate the allegations in this case in order to obtain a U visa. Marroquin-Aldana also sought information as to when Lissette became aware of her immigration problems, and as to any attempts to resolve them.

[¶18] By a written order dated May 4, 2012, the court concluded that "[t]he proper custodian of records of such documents is the Immigration and Naturalization Service, and . . . a subpoena for production of these documents is more properly directed toward that agency." The court "decline[d] to require [Lissette] to produce the documents directly, because of the court's concern that . . . this may invade confidential communications between [Lissette] and her

---

[14] Rule 17 was amended effective January 1, 2014; among other changes, the Rule was renamed to make clear that it exclusively governs subpoenas seeking the attendance of witnesses and any attendant production of documentary or other tangible evidence. *See* M.R. Crim. P. 17 Advisory Note to 2014 amend. Newly adopted Rule 18 governs subpoenas seeking production of documentary or other tangible evidence without witness attendance. *See* M.R. Crim. P. 18 Advisory Note to 2014 amend. Because these changes do not affect Marroquin-Aldana's appeal, we refer here to Rule 17 as it existed prior to the January 1, 2014, amendment.

immigration counsel." In accordance with the court's order, Marroquin-Aldana then served a subpoena on U.S. Citizenship and Immigration Services,[15] which declined to produce the records on the grounds that the subpoena was unenforceable.

[¶19] Marroquin-Aldana then served a subpoena on Lissette's immigration attorney[16] seeking the attorney's

> entire immigration file(s) of [Lissette] . . . including but not limited to all documents, writings, records, etc. in whatever form related in any way to [Lissette's] immigration status and problems related to her status and her unsuccessful and/or successful attempts to resolve such problems from the time of onset of such problems through the present time including but not limited to the application for a U Visa and all related and supporting documentation.

Marroquin-Aldana also filed a motion in limine pursuant to Rule 17(d) to enforce the subpoena. In response, Lissette's attorney filed a motion to quash the subpoena. A hearing was held on the motions on July 12, 2012. At the hearing, defense counsel stated that she was seeking "anything that [Lissette] filed" with immigration authorities and any "letters that would be sent" to Lissette by immigration authorities.

---

[15] Defense counsel represented to the trial court that the Immigration and Naturalization Service had been abolished and U.S. Citizenship and Immigration Services had assumed its relevant functions. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 451, 471, 116 Stat. 2135 (codified as amended at 6 U.S.C.A. §§ 271, 291 (West, Westlaw through P.L. 113-74 approved 1-16-14)).

[16] On Marroquin-Aldana's motion, the court had ordered the State to disclose the attorney's name to Marroquin-Aldana if the State knew the attorney's name or if Lissette was willing to disclose it. The State provided the name to Marroquin-Aldana.

12

[¶20]  By a written order dated July 23, 2012, the court concluded that there was insufficient justification for disclosure of the documents because the State had already produced a copy of the District Attorney's certification[17] in support of Lissette's U visa application, and Marroquin-Aldana could therefore call Lissette's credibility into question based on her attempts to seek protection from deportation based on her assistance with Marroquin-Aldana's prosecution.  To the extent that Marroquin-Aldana sought materials other than the U visa application itself, the court concluded that "that effort can only be viewed as the proverbial 'fishing expedition.'"  The court also noted the high level of protection given to confidential communications between attorney and client, and the protections given to documents filed with immigration authorities pursuant to federal law.  The court therefore denied Marroquin-Aldana's motion in limine and granted the motion to quash.

[¶21]  Throughout the pretrial proceedings, Marroquin-Aldana filed several motions to continue, including an unopposed motion to continue the case from the February 2012 trial list, a joint motion to continue the case from the April 2012 trial list, and an unopposed motion to continue the case from the June 2012 trial list.  The court granted each of these motions, but indicated that the case "really

---

[17]  U visa applications must be accompanied by "a certification from a Federal, State, or local law enforcement official, prosecutor, judge, or other Federal, State, or local authority . . . . stat[ing] that the alien has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of criminal activity" set forth by statute.  8 U.S.C. § 1184(p)(1) (quotation marks omitted).

needs to be tried in August" due to the victim's age and because Marroquin-Aldana had not posted bail and remained in custody. The court thereafter denied Marroquin-Aldana's fourth and fifth motions to continue the trial.

[¶22] A six-day jury trial was held beginning on August 16, 2012. At the outset of the trial, the court conducted a voir dire to determine the victim's competence to testify. Based on the voir dire, the court found that the victim was not disqualified from testifying because she was capable of communicating about the issues in the case, understood the duty to tell the truth, and had sufficient ability to remember events.

[¶23] Spanish interpreters were present to assist Marroquin-Aldana throughout the proceedings. Carolina also required a Spanish interpreter during her testimony. At trial, there were up to four interpreters present. The court consistently asked that counsel and witnesses speak slowly and loudly to ensure that the interpreters could hear and keep up with the testimony and arguments of counsel. The court routinely asked Marroquin-Aldana whether he had understood what had been said during the proceedings. Marroquin-Aldana invariably said that he had.

[¶24] Some issues of interpretation arose during the trial. After a suppression hearing held on the second day of trial, two of the interpreters raised concerns about another interpreter's translations of Carolina's answers during the

14

hearing. The court discussed the issues with the interpreters and counsel at length in chambers. The interpreters who raised the concerns listened to an audio recording of Carolina's testimony and revised the record to more accurately reflect what was said. The court concluded that the interpretation issues that were raised all related to "collateral" issues and did not call into question the court's ruling on the suppression motion. The court also concluded that it needed to be more assertive in interrupting Spanish-speaking witnesses to allow the interpreters to keep up. Finally, the court decided to excuse the interpreter at issue and work with three interpreters during the trial rather than four.

[¶25] More interpretation issues arose on the fifth day of trial. First, during Carolina's testimony, one of the interpreters present in the courtroom indicated to the court that Carolina's interpreter had incorrectly interpreted a word meaning "Mrs." or "ma'am" as "sign."[18] After reviewing the court reporter's notes with the interpreters, defense counsel indicated to the court that the error was "not substantive," and the court authorized counsel to go back over "anything that you

---

[18] The testimony in question apparently came in response to defense counsel's questions regarding whether the victim had complained of physical issues while Carolina was there:

> Yeah, when I started working there she always—she would always say to me, Carolina, I sense—I feel as though I have a hair. And I would look but I wouldn't see anything and I would say—I didn't know what to say. I spoke to [Lissette] and I said that there was no sign of anything.

Carolina later clarified that the victim had complained about her throat and that Carolina saw something in the victim's throat that could have been a cat hair, and told Lissette about it.

have so . . . that you can be satisfied that the interpretation is proper." The court agreed with counsel's suggestion that if any similar issues arose, the interpreters should signal for a sidebar conference. Defense counsel then went back over the testimony in question with Carolina.

[¶26] Shortly after that exchange, defense counsel reported to the court that Marroquin-Aldana had requested a different interpreter for Carolina, as he believed that "some things . . . have been omitted." The court immediately took a recess to permit counsel to speak with Marroquin-Aldana and determine what the issue was. Upon reconvening, defense counsel stated that "unlike what . . . [Marroquin-Aldana] first advised me, he has not noticed anything omitted from the interpretation." Rather, Marroquin-Aldana said that when Carolina's interpreter was interpreting for *him*,[19] the interpreter seemed to get "tongue tied or stuck or didn't seem to complete the thought." Marroquin-Aldana therefore suggested that the people that the interpreter was translating for needed to speak more slowly, because he did not notice this when people spoke slowly. He also believed that the interpreter in question was speaking too softly and not pronouncing words clearly enough.

[¶27] The court, noting that "there is no indication of any omissions" in the interpretation, concluded that a change of interpreters was not necessary. The

---

[19] The interpreters rotated throughout the trial.

court noted that adjustments had been made to the microphone in response to jurors' reports that they were having trouble hearing the interpreters, and indicated that it would remind the jurors to signal to the court if they had trouble hearing. The court also noted that Carolina was breaking up her answers into shorter parts to allow the interpreter to keep up. The court stated that it had been "watching very carefully throughout the trial" and that "the interpreters . . . in this case are certified and in my judgment very skilled." The court also stated that it had reminded the interpreters during the recess to speak loudly and clearly.

[¶28] Two other interpretation issues arose during Carolina's testimony. In response to a question as to how she first came into contact with Lissette, Carolina's response was first translated as: "[A] woman told me then that she had a couple that needed—that needed someone . . . ." Another interpreter asked for a sidebar, and indicated that Carolina had actually said that a woman told her that she had a friend who was looking for a couple to come stay in her house to help them. All of the interpreters agreed that the correction was accurate, and the court directed the original interpreter to correct the answer for the jury. After that interpreter attempted to correct the answer, the interpreter who raised the issue then

restated the correction that had been agreed upon at sidebar: "I have a friend [who's] looking for a couple to come stay in their house to help them."[20]

[¶29]  On the last day of trial, one of the interpreters raised a concern about her interpretation of one of Carolina's answers the previous day regarding why she did not change the victim into pajamas the night that they went to the movies.  The interpreter recalled that her interpretation "was to the effect [that] she did not put on pajamas, or meaning she did not put on pajamas that night."[21]  In hindsight, however, the interpreter felt that it might have been more accurate to say that the victim did not normally wear pajamas.  The court permitted defense counsel to follow up with Carolina to clarify her response, and defense counsel agreed with that approach.  In response to defense counsel's follow-up questions, Carolina testified simply that she did not recall what the victim was wearing that night, and was not in charge of changing her.  Defense counsel did not ask Carolina if the victim usually wore pajamas.

[¶30]  During an in-chambers conference on the last day of the trial, the court indicated that this was the first time he had worked with a "team" of interpreters and that he had therefore never had an arrangement where "one

---

[20]  The original interpreter's initial attempt at correcting the testimony was: "Clarification, the woman . . . stated I have a friend, a couple, who needs help."  She agreed with the ultimate correction provided to the jury.

[21]  The original interpretation was in fact that "the girl didn't want to put on pajamas . . . to sleep," and that "I never put pajamas . . . on her."

interpreter can ask to be heard on another interpreter's work." The court saw the issues raised by the interpreters "as a strength, not as a problem," because that process "provided an additional level of assurance about the quality of the work that was done."

[¶31] At the close of the State's case-in-chief, the court granted Marroquin-Aldana's motion for a judgment of acquittal as to the count of unlawful sexual contact. On August 23, 2012, the jury found Marroquin-Aldana guilty of gross sexual assault. On December 4, 2012, the court sentenced Marroquin-Aldana to the Department of Corrections for a term of twenty-four years, followed by a twenty-five-year term of supervised release. Marroquin-Aldana was ordered to pay $4670 as restitution for the benefit of the victim's family or the Victims' Compensation Fund. Marroquin-Aldana timely filed a notice of appeal on December 19, 2012.[22]

## II.  DISCUSSION

A.    Immigration Records

[¶32] Marroquin-Aldana argues that the trial court erred or abused its discretion in denying his motion in limine pursuant to Rule 17(d) and granting the

---

[22] The same day, Marroquin-Aldana also filed an application for leave to appeal his sentence. We denied Marroquin-Aldana leave to appeal his sentence by an order dated April 23, 2013.

motion to quash filed by Lissette's immigration attorney.[23] Specifically, Marroquin-Aldana argues that the trial court erred in failing to apply Maine Rule of Evidence 510 regarding waiver of privileges. In the alternative, Marroquin-Aldana contends that the court's order constitutes an abuse of discretion because his effort to obtain Lissette's immigration records was not a "fishing expedition" in that "[defense] counsel was aware that actual documents existed and that immigration information pertinent to the U Visa application would be found in those documents." This information, Marroquin-Aldana argues, was critical to his ability to impeach Lissette and develop her motive to fabricate. Marroquin-Aldana contends that the court's error amounts to a deprivation of his constitutional rights to due process, compulsory process, and confrontation.

1.    Standards of Review

[¶33]  We review a court's decision on a motion to quash for an abuse of discretion. *See State v. Watson*, 1999 ME 41, ¶ 5, 726 A.2d 214 ("The decision to quash a subpoena duces tecum rests in the discretion of the court.")  Because Marroquin-Aldana concedes that he did not raise his constitutional arguments in

---

[23]    Marroquin-Aldana broadly contends that "[a]ll avenues taken . . . to obtain Lissette['s] . . . immigration records were thwarted by the trial court." His legal arguments, however, primarily concern the court's decision with respect to the subpoena directed to Lissette's immigration attorney. To the extent that Marroquin-Aldana's brief can be read to challenge any other action by the court regarding the immigration records, we deem any such arguments waived for failure to adequately develop them in briefing. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).

20

the trial court, we review that issue only for obvious error. *See State v. Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032; *State v. Pabon*, 2011 ME 100, ¶ 18, 28 A.3d 1147. We have described obvious-error review as follows:

> Obvious error review requires us to consider if there is (1) an error, (2) that is plain, and (3) that affects substantial rights. If these conditions are met, we will exercise our discretion to notice an unpreserved error only if we also conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings. [A]n error affects a criminal defendant's substantial rights if the error was sufficiently prejudicial to have affected the outcome of the proceeding.

*State v. Patton*, 2012 ME 101, ¶ 30, 50 A.3d 544 (alteration in original) (citations and quotation marks omitted); *see also Pabon*, 2011 ME 100, ¶¶ 18-29, 28 A.3d 1147 (discussing obvious-error standard).

2.    Analysis

[¶34] Rule 17(c) of the Maine Rules of Criminal Procedure provides that "[a] subpoena may . . . command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable, oppressive or in violation of constitutional rights." The purpose of a subpoena duces tecum is not to "expand the discovery rights of the parties," but rather "to facilitate and to expedite the trial." *Watson*, 1999 ME 41, ¶ 5, 726 A.2d 214 (quotation marks omitted). To withstand a motion to quash pursuant to

Rule 17(c), the party seeking to enforce the subpoena must make a preliminary showing

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general fishing expedition.

*Id.* ¶ 6 (quotation marks omitted). Stated more simply, this test requires a showing of relevancy, admissibility, and specificity. *See United States v. Nixon*, 418 U.S. 683, 699-700 (1974) (applying Fed. R. Crim. P. 17(c)).

[¶35] To satisfy the requirement of specificity, a subpoena must generally request specific documents or at least a narrowly defined set of documents. *See United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002) ("Courts have held that requests for an entire file are evidence of an impermissible fishing expedition."); *United States v. Reed*, 726 F.2d 570, 577 (9th Cir. 1984) (affirming trial court order quashing defendants' subpoena after in-camera review where the defendants "did not request specific documents, but sought entire arson investigation files"). The name of a document and mere speculation as to its contents are not sufficient to satisfy the Rule's specificity and relevance requirements. *See United States v. Hardy*, 224 F.3d 752, 755-56 (8th Cir. 2000) (upholding trial court's order quashing defendant's subpoena of recorded police radio transmissions where the

defendant had "stated why he wants to listen to the transmissions, but he cannot set forth what the subpoenaed materials contain"); *United States v. Arditti*, 955 F.2d 331, 345-46 (5th Cir. 1992) (holding that the trial court did not abuse its discretion in quashing a subpoena where the defendant "demonstrated why he wants to look into the [subpoenaed] material, but . . . has not set forth what the subpoena[ed] materials contain, forcing the court to speculate as to the specific nature of their contents and its relevance").

[¶36]    Here, Marroquin-Aldana's subpoena broadly sought Lissette's attorney's

> entire immigration file(s) . . . including but not limited to all documents, writings, records, etc. in whatever form related in any way to [Lissette's] immigration status and problems related to her status and her unsuccessful and/or successful attempts to resolve such problems from the time of onset of such problems through the present time including but not limited to the application for a U Visa and all related and supporting documentation.

At the hearing, defense counsel narrowed the scope of the subpoena only slightly, indicating that Marroquin-Aldana was seeking "anything that [Lissette] filed" with immigration authorities and any "letters that would be sent" to Lissette by immigration authorities.

[¶37]  Marroquin-Aldana's subpoena, seeking a broad range of documents comprising Lissette's attorney's "entire immigration file(s)," bears the hallmarks of an impermissible fishing expedition.  *See Morris*, 287 F.3d at 991; *Reed*,

726 F.2d at 577. The only document identified with any specificity is Lissette's U visa application. Marroquin-Aldana failed to show what specific information the application would contain that would be relevant to his defense. *See Hardy,* 224 F.3d at 755-56; *Arditti,* 955 F.2d at 345-46. As we have stated, Rule 17 is not a discovery device. *See Watson,* 1999 ME 41, ¶ 5, 726 A.2d 214; *see also Nixon,* 418 U.S. at 698 ("[T]he subpoena duces tecum . . . was not intended to provide a means of discovery for criminal cases . . . ."); *United States v. Nixon,* 777 F.2d 958, 968-69 (5th Cir. 1985) ("[D]efendants were attempting to use the subpoena duces tecum as a discovery device, which it is not."). The court therefore did not abuse its discretion in denying Marroquin-Aldana's motion in limine and quashing Marroquin-Aldana's subpoena pursuant to Rule 17.

[¶38] Because we conclude that Marroquin-Aldana's subpoena failed to meet the requirements of Rule 17, we need not reach his constitutional arguments.[24] *See United States v. LaRouche Campaign,* 841 F.2d 1176, 1178 (1st Cir. 1988) ("[W]e consider first [the] contention that the defendants' subpoena failed to satisfy the requirements of Rule 17(c); for we need not address the competing constitutional interests in question unless the defendants' subpoena met those requirements."). In any event, we are not convinced that the court committed

---

[24]   Marroquin-Aldana does not contend that the requirements of Rule 17 infringe upon his constitutional rights.

obvious error in the circumstances of this case. Marroquin-Aldana was aware of Lissette's attempt to obtain a U visa based on her assistance in Marroquin-Aldana's prosecution, and had obtained in discovery a copy of the District Attorney's certification in support of Lissette's application. Marroquin-Aldana's lack of access to Lissette's attorney's file did not prevent him from impeaching Lissette based on her immigration issues and her U visa application. In fact, defense counsel vigorously cross-examined Lissette regarding her immigration issues and her motive to fabricate in order to resolve those issues. *See United States v. Brown,* 347 F.3d 1095, 1098-99 (9th Cir. 2003) (holding that the quashing of a defendant's subpoena for a prosecution witness's complete immigration file did not violate the defendant's confrontation rights where the defendant's cross-examination "enabled the jury sufficiently to assess [the witness's] credibility").

[¶39] In light of the evidence of Lissette's motive to fabricate presented at trial, the possibility that any evidence contained in Lissette's attorney's file would have appreciably affected the jury's perception of Lissette's credibility is remote. We therefore conclude that the court did not commit obvious error in denying Marroquin-Aldana's motion in limine and granting the motion to quash. *See Patton,* 2012 ME 101, ¶ 30, 50 A.3d 544 ("[W]e will exercise our discretion to notice an unpreserved error only if we . . . conclude that . . . the error seriously

affects the fairness and integrity or public reputation of judicial proceedings." (quotation marks omitted)).

B.    Interpretation Services

[¶40]   Marroquin-Aldana argues that defects in the interpretation services provided at trial deprived him of his constitutional rights to due process and to confrontation.   Because Marroquin-Aldana did not raise any objection to the interpretation at trial, we review only for obvious error.  *See Dolloff*, 2012 ME 130, ¶ 35, 58 A.3d 1032; *Patton*, 2012 ME 101, ¶ 30, 50 A.3d 544; *Pabon*, 2011 ME 100, ¶¶ 18, 29, 28 A.3d 1147.

[¶41]   "[I]t is an unquestioned principle that a defendant must be afforded the means to understand the proceedings against him." *State v. Poblete*, 2010 ME 37, ¶ 27, 993 A.2d 1104 (quotation marks omitted).   Maine law therefore guarantees criminal defendants with "limited English proficiency" the right to an interpreter.   *Id.* (quotation marks omitted); *see also* 5 M.R.S. § 51 (2013);[25] M.R. Crim.  P.  28;[26]  Guidelines   for   Determination   of   Eligibility   for

---

[25] Title 5 M.R.S. § 51 (2013) provides, in relevant part: "When personal or property interest of a person who does not speak English is the subject of a proceeding before an agency or a court, the presiding officer of the proceeding shall either appoint a qualified interpreter or utilize a professional telephone-based interpretation service."

[26] Rule 28 of the Maine Rules of Criminal Procedure provides:  "The court may provide, or when required by administrative order or statute shall provide, to individuals eligible to receive court-appointed interpretation or translation services, an interpreter or translator and determine the reasonable compensation for the service when funded by the court.  An interpreter or translator shall be appropriately

Court-Appointed Interpretation and Translation Services, Me. Admin. Order JB-06-3 (as amended by A. 7-13) (effective July 16, 2013).[27] Interpreters must be qualified as expert witnesses and appropriately sworn. *See* M.R. Evid. 604.[28]

[¶42] We have "strongly encouraged trial courts to be vigilant in ensuring that interpreters perform their appropriate role in a judicial proceeding, namely providing a precise and accurate translation of the exact testimony of a witness." *Poblete*, 2010 ME 37, ¶ 27, 993 A.2d 1104 (quotation marks omitted). We have made clear, however, that "minor deviations from the rules governing interpreters will not necessarily render a trial fundamentally unfair." *Id.*; *see also, e.g.*, *id.* ¶¶ 16-18, 28-29 (upholding trial court's denial of the defendant's motion for a mistrial where the defendant "presented no evidence that the lack of a word-for-word contemporaneous translation" of certain testimony affected his decision to testify); *State v. Green*, 564 A.2d 62, 63-64 (Me. 1989) (concluding that the failure to appropriately qualify or swear in an interpreter did not deprive

---

sworn." Rule 43(l) of the Maine Rules of Civil Procedure provides for the appointment of interpreters in civil cases.

[27] By administrative order, the Judicial Branch provides an interpreter for "persons with limited English proficiency . . . . who are parties or witnesses in any type of court case." Guidelines for Determination of Eligibility for Court-Appointed Interpretation and Translation Services, Me. Admin. Order JB-06-3 (as amended by A. 7-13) (effective July 16, 2013). "[P]ersons with limited English proficiency" are "individuals whose primary language is a language other than English and whose ability to speak English is not at the level of comprehension and expression needed to participate effectively in court transactions and proceedings." *Id.*

[28] Marroquin-Aldana does not suggest that any of the interpreters in this case were not appropriately qualified or sworn.

the defendant of a fair trial); *State v. Doucette*, 398 A.2d 36, 39-40 (Me. 1978) (holding that an interpreter's "occasional lapses from first to third person" when interpreting for the victim did not deprive the defendant of a fair trial).

[¶43] Here, the trial court carefully ensured that the proceedings were accurately interpreted. The court routinely asked Marroquin-Aldana whether he understood what was said during the proceedings, and Marroquin-Aldana invariably replied in the affirmative. The court repeatedly asked that counsel and witnesses speak slowly and clearly for the benefit of the interpreters. Marroquin-Aldana also had the unusual benefit of having multiple interpreters present in the courtroom throughout the trial; on several occasions, the interpreters alerted the court to errors by other interpreters. The court took corrective action in every instance that such an issue arose, whether by excusing an interpreter, asking the interpreters to speak more loudly and clearly, directing the interpreters to correct an error for the jury, or permitting counsel to elicit further testimony to clarify a potential error.[29]

[¶44] The mere fact that interpretation issues arose does not call into question the fundamental fairness of the trial where the court promptly addressed those issues and took appropriate action to correct any defects. That interpretation

---

[29] Marroquin-Aldana contends that the possible issue with Carolina's testimony regarding the victim's pajamas was "never rectified." The court, however, gave Marroquin-Aldana an opportunity to explore this issue through further testimony; defense counsel failed to elicit testimony to clarify the issue.

issues were identified and corrected bolsters, rather than undermines, confidence in the process instituted by the trial court. Indeed, we commend the court for its vigilance and adaptability in overseeing a particularly complex trial. We discern no error, much less an error that affects Marroquin-Aldana's substantial rights or "seriously affects the fairness and integrity or public reputation of judicial proceedings" so as to constitute obvious error. *See Patton*, 2012 ME 101, ¶ 30, 50 A.3d 544 (quotation marks omitted).

C.   Other Issues

[¶45]   We do not find persuasive Marroquin-Aldana's arguments that the trial court erred or abused its discretion in denying his motions to continue the trial or in finding the victim competent to testify at trial, and therefore do not address those arguments further. *See State v. Cochran*, 2004 ME 138, ¶ 6, 863 A.2d 263 (stating that "[a] trial court's ruling on witness competency is a factual one that we review for clear error" and that "a child of any age is competent to be a witness unless disqualified" (quotation marks omitted)); *State v. Dechaine*, 572 A.2d 130, 132 (Me. 1990) ("The decision to deny a motion for a continuance is committed to the discretion of the trial justice, and will be disturbed on appeal only for an abuse of that discretion." (quotation marks omitted)).

The entry is:

Judgment affirmed.

---

**On the briefs:**

Jeremy Pratt, Esq., Camden, for appellant Elfido Marroquin-Aldana

Geoffrey Rushlau, District Attorney, Prosecutorial District 6, Wiscasset, and Deborah P. Cashman, Asst. Atty. Gen., Augusta, for appellee State of Maine

**At oral argument:**

Jeremy Pratt, Esq., for appellant Elfido Marroquin-Aldana

Deborah P. Cashman, Asst. Atty. Gen., for appellee State of Maine

Lincoln County Superior Court docket number CR-2011-202
FOR CLERK REFERENCE ONLY