MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2025 ME 77
Docket:       Kno-24-164
Argued:       May 8, 2025
Decided:      August 19, 2025

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, DOUGLAS, and LIPEZ, JJ.

# STATE OF MAINE

v.

# HASAHN A. CARTER

CONNORS, J.

[¶1] Hasahn A. Carter appeals from a judgment of conviction, entered by the trial court (Knox County, *Hjelm, A.R.J.*) following a four-day jury trial, for robbery, elevated aggravated assault, kidnapping, burglary, theft by unauthorized taking, criminal threatening with a dangerous weapon, aggravated criminal trespass, cruelty to animals, and criminal mischief. Carter contends that the suppression court (*Billings, J.*) erred in denying his motion to suppress evidence gathered from his cellphone. Carter further argues that the trial court (*Hjelm, A.R.J.*) abused its discretion by denying his motion under Maine Rule of Unified Criminal Procedure 17A(f) to subpoena privileged or documentary evidence from a nonparty. We disagree and affirm the judgment.

2

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the court's order on the motion to suppress, *see State v. Bailey,* 2010 ME 15, ¶ 3, 989 A.2d 716, and to the jury's verdict, *see State v. Rancourt,* 435 A.2d 1095, 1097 (Me. 1981), the record supports the following facts.

[¶3]  The victims (husband, wife, son, and family dog) lived in Hope, Maine, where the husband and wife owned and operated a medicinal marijuana cultivation business on their property.[1]  On October 12, 2020, the victims were at home watching television together in the parents' second-floor bedroom, where they eventually fell asleep.  Struggling to sleep with everyone in the same room, the father eventually moved to another bedroom in the home.

[¶4]  Around 2:00 a.m., the mother awoke to a crashing sound.  She looked down the stairs to the first floor, where she saw a man with a mask pointing a gun at her, saying, "We are the cops, you are drug dealers."  She turned into her room, closed the door behind her, and told the intruder to leave her house.  The man ran up the stairs and kicked in her door.  More men followed up the stairs, but they went down the hallway out of the mother's

---

[1]  We use the term "victim" to describe each family member who was present at the time of the home invasion but note that the term may also include another immediate family member when—as is the case here—the underlying crime causes serious physical trauma or serious financial loss. *See* 17-A M.R.S. § 2101(2)(B)(1) (2025).

sight. She saw a total of four intruders during the home invasion; one of them had a gun, and another carried a taser.

[¶5] The father awoke to his wife screaming and went to the door of the bedroom where he was sleeping. When he opened the door, two masked men were standing there. One of them was holding a gun in the father's face. The man with the gun pistol-whipped the father in the head. The men stripped the father of what clothing he had on and zip-tied his hands and feet. They proceeded to beat the father, breaking his orbital bone and sinuses.

[¶6] The masked man guarding the wife and son eventually brought them into the room where the intruders were holding the father—who was zip-tied and bleeding from the head. The intruders demanded eighty thousand dollars before continuing to beat the father and electrocute him with the taser.

[¶7] Eventually, the intruders moved the victims to another room and set a timer on one of their phones, telling the family that bad things would happen if they did not have the money when the timer went off.

[¶8] Three of the intruders left to go to the shop where the parents ran their marijuana cultivation business. After the three left, the man who stayed guarding the family told the son to get the sheet off the bed to cover his father. The father had a lot of blood on his hands from his head injury and was able to

4

slide his hands out of the zip ties but was unable to free his legs. The man led the family to the parents' bedroom, and in the process, the son retrieved scissors from his mother's office and gave them to his father. The father then cut the zip ties that were binding his feet.

[¶9] Once the father was free from his restraints, he grabbed the man holding them at gunpoint and pushed him down the stairs. As the man fell, he grabbed the son, and they both fell to the landing below. The father jumped down the flight of stairs and broke his foot when he landed. He then tackled the man who had grabbed onto the son, and the two struggled on the landing before the intruder ran away. The father yelled to his wife to call 9-1-1 and grab his gun.

[¶10] The family then moved to a stairwell where they could lock the doors while they were on the phone with the 9-1-1 dispatcher and waited for law enforcement to arrive. At some point, the family heard a recurring alarm from a phone that they located in the stairway where the father had struggled with one of the intruders.[2]

---

[2] Although it is not clear when, at some point during the invasion, the intruders tased the family dog. The father removed a taser dart from the dog and gave it to the first responding officer.

[¶11]   After law enforcement arrived and secured the area, the family spoke with the responding officer and handed over the phone they found, which the officer then locked in his police cruiser.

[¶12]   The officer then canvased the area around the home and discovered a black surgical mask.  He did not touch the mask at that time because a canine was coming to track and needed an article from which to get a scent.

[¶13]   The Knox County Sheriff's Department on-call detective also responded to the scene.  The detective took possession of the cellphone found in the stairway and eventually collected the black surgical mask that the officer discovered near the house.  The detective saw that the phone was low on battery, so he plugged it into the power source in his cruiser and locked the vehicle before eventually turning it over to a second detective the day after the home invasion.

[¶14]  Shortly after receiving the phone, the second detective activated the emergency call button on the home screen without accessing the phone through its passcode.  He then called 9-1-1 and spoke to the dispatcher, who gave him the associated phone number.  The detective entered the number into an online search and determined that it was associated with Verizon.  He then

6

sent a preservation letter to Verizon and applied for a search warrant to search the contents of the phone, which was granted. The search warrant and its supporting affidavit did not include any information gathered through the emergency call function.

[¶15] The detective received help searching the phone from an analyst at the Androscoggin County Sheriff's Office. The analyst utilized software called GrayKey to bypass the phone's passcode and extract data from the device. He then focused his examination on data generated around the time of the offenses and discovered that a "police scanner" app and a "police light" app were downloaded the day before the home invasion. Further examination of the phone uncovered the associated phone number and established Carter as a suspect. The detective filed an inventory of the search with the court on October 22, 2020. On October 26, 2020, the detective applied for and was granted a second warrant to search the Verizon records and location data associated with the phone, which showed that the device had traveled from Brockton, Massachusetts, to Hope, Maine.[3]

[¶16] Based on the information he had gathered, the detective applied for and was granted an arrest warrant. Local authorities arrested Carter in

_____

[3] This second warrant was not entered in evidence during the suppression hearing or otherwise made part of the record on appeal.

Brockton, Massachusetts, and he was returned to Maine. The detective received a court order to take a DNA sample from Carter, which was sent to the state lab for comparison with a sample taken from the black surgical mask; the two samples were a match.[4]

[¶17] In June 2022, a grand jury indicted Carter on the following eleven counts: (1) robbery (Class A), 17-A M.R.S. § 651(1)(E) (2025); (2) robbery (Class B), *id.* § 651(1)(A); (3) elevated aggravated assault (Class A), 17-A M.R.S. § 208-B(1)(A) (2025); (4) kidnapping (Class A), 17-A M.R.S. § 301(1)(B)(1) (2025); (5) burglary (Class A), 17-A M.R.S. § 401(1)(B)(1) (2025); (6) theft by unauthorized taking (Class B), 17-A M.R.S. § 353(1)(B)(1) (2025); (7) criminal threatening with a dangerous weapon (Class C), 17-A M.R.S. §§ 209(1), 1604(5)(A) (2025); (8) terrorizing with a dangerous weapon (Class C), 17-A M.R.S. §§ 210(1)(A),[5] 1604(5)(A) (2023); (9) aggravated criminal trespass (Class C), 17-A M.R.S. § 402-A(1)(A) (2025); (10) cruelty to animals (Class D),

---

[4] The DNA analyst from the state forensic laboratory testified that there was a random match probability of less than one in thirty-six billion.

[5] Title 17-A M.R.S § 210 has since been amended to address the constitutional issues raised by *Counterman v. Colorado*, 600 U.S. 66 (2023). *See* P.L. 2023, ch. 519, § 1 (effective Mar. 6, 2024) (codified at 17-A M.R.S. § 210 (2025)). As discussed below, the trial court dismissed Count 8 without objection from the State because, as charged, it was unconstitutional according to the *Counterman* decision. *See infra* ¶ 20.

8

17 M.R.S. § 1031(1)(D) (2025); (11) criminal mischief (Class D), 17-A M.R.S. § 806(1)(A) (2025).

[¶18] In October 2022, Carter filed a motion under M.R.U. Crim. P. 17A(f) to subpoena privileged or documentary evidence from a nonparty. The court (*Hjelm, A.R.J.*) denied that motion without a hearing because it was facially insufficient under the Rule's requirements. The defendant renewed that motion in January 2023, and the court held a hearing at the end of April. The renewed motion sought documents from the victims, including business records covering a roughly seven-month period ending with the alleged offense date concerning the names of people from outside Maine who purchased marijuana from the victims, copies of their driver's licenses or other identification documents, the nature and dates of the transactions, the amount of money involved in the transactions, and the amount of any balance owed by the victims to those people. The court denied the renewed motion in limine in early May of that year.

[¶19] In June 2023, Carter filed a motion to suppress the evidence gathered from his cellphone. The suppression court (*Billings, J.*) held a hearing on the motion in July 2023. The court made limited factual findings, which included that the cellphone in question was found on a stairway in the home

where the alleged crimes occurred, that the cellphone was password protected, and that around thirty hours after the phone was found, a detective activated the phone's emergency function from the phone's lock screen to dial 9-1-1 and obtained the phone's number. Primarily relying on *State v. Hill*, the suppression court denied Carter's motion to suppress, reasoning that Carter had no expectation of privacy in his phone number, and thus there was no search within the meaning of the Fourth Amendment. *See* 789 S.E.2d 317, 318–21 (Ga. Ct. App. 2016) (concluding that the defendant had no reasonable expectation of privacy in his own phone number, name on his cellular account, or his date of birth, which were obtained by the officer dialing 9-1-1 from the defendant's phone).

[¶20] In November 2023, Carter filed a motion to dismiss Counts 1 and 8 of the indictment. The trial court (*Hjelm, A.R.J.*) held a hearing on the motion at which the State agreed to dismiss Count 8 (terrorizing) based on potential constitutional issues following the United States Supreme Court's decision in *Counterman v. Colorado*, 600 U.S. 66 (2023). The court granted the motion to dismiss Count 1 (Class A robbery) over the State's objection because it concluded that Count 1 did not include an allegation of the requisite state of mind.

[¶21]  The court held a four-day jury trial in December 2023, and the jury returned guilty verdicts on all remaining counts.  On March 28, 2024, the court sentenced Carter to the following concurrent terms of imprisonment: twenty years for kidnapping; ten years each for robbery, elevated aggravated assault, and burglary; five years each for theft by unauthorized taking, criminal threatening with a dangerous weapon, aggravated criminal trespass; eleven months for cruelty to animals; and six months for criminal mischief.  The court suspended all but fourteen years of the concurrent sentences and imposed four years of probation.  Carter timely appealed.  *See* M.R. App. P. 2B(b)(1); 15 M.R.S. § 2115 (2025).

## II.  DISCUSSION

### A.    We affirm the denial of Carter's motion to suppress based on the independent source doctrine.

[¶22]  We review the suppression court's factual findings for clear error and its ultimate determination regarding suppression de novo.  *State v. Bryant,* 2014 ME 94, ¶ 8, 97 A.3d 595.  Carter argues that the detective's use of the emergency call function on his cellphone constituted an unlawful warrantless search under the Fourth Amendment; therefore, the court erred in denying his M.R.U. Crim. P. 41A motion to suppress the evidence gathered from his

cellphone and any other evidence derived therefrom.[6]

[¶23] Our inquiry is not limited to the suppression court's reasoning, and we will affirm if any reasonable view of the evidence supports the decision. *See United States v. Gonzalez-Arias*, 946 F.3d 17, 23 (1st Cir. 2019); *see also State v. Ouellette*, 2024 ME 29, ¶ 11, 314 A.3d 253 ("We will uphold the court's denial of a motion to suppress if any reasonable view of the evidence supports the trial court's decision." (quotation marks omitted)).

[¶24] The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). As a means of enforcing this right, the United States Supreme Court developed the exclusionary rule in *Weeks v. United States*,

---

[6] On appeal, Carter also argues that the Maine Constitution prohibits law enforcement's warrantless use of the emergency call function on his cellphone. Carter, however, did not develop this argument before the trial court. Therefore, it is waived. *See State v. Norris*, 2023 ME 60, ¶¶ 33-36, 302 A.3d 1; *State v. Moore*, 2023 ME 18, ¶ 20, 290 A.3d 533. Moreover, Carter has not raised any arguments regarding whether article I, section 5 of the Maine Constitution includes an exclusionary rule, a prerequisite to the requested relief in this case. *See Norris*, 2023 ME 60, ¶ 36, 302 A.3d 1 ("With respect to a claim that evidence should have been suppressed pursuant to the Maine Constitution, it is particularly important to develop an independent analysis of article I, section 5 because we have yet to rule definitively whether that provision even incorporates an exclusionary rule.").

232 U.S. 383, 398 (1914) and incorporated it to apply to the states in *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The rule prohibits the introduction of evidence seized during an unlawful search as well as any derivative evidence discovered as a result of that search. *See Murray v. United States,* 487 U.S. 533, 536-37 (1988). But it is not without exceptions.[7] Applicable here is the independent source exception which, in keeping with the Fourth Amendment's touchstone principle of reasonableness, *see Jimeno*, 500 U.S. at 250, "allows the admission of evidence which was gained through an independent source as well as the tainted source." *United States v. Silvestri,* 787 F.2d 736, 740 (1st Cir. 1986).

---

[7] Although the State argued before the trial court that the inevitable discovery exception to the warrant requirement applied, we choose not to rely on that exception because it focuses on a hypothetical gathering of information after an alleged illegal search as opposed to the situation presented here where law enforcement actually gathered the same information through a legally obtained warrant. As we have previously stated, "[t]he inevitable discovery exception to the exclusionary rule derives from the independent source doctrine, 'but it differs in that the question is not whether the police did in fact acquire certain evidence by reliance upon an untainted source but instead whether evidence found because of a Fourth Amendment violation would inevitably have been discovered lawfully.'" *State v. Storer*, 583 A.2d 1016, 1019–20 (Me. 1990) (quoting 4 Wayne R. LaFave, *Search & Seizure* § 11.4(a) at 378 (2d ed. 1987)). As described by the United States Supreme Court in *Murray v. United States*:

> The inevitable discovery doctrine, with its distinct requirements, is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered.

487 U.S. 533, 539 (1988). Thus, the independent source exception applies when, through a subsequent legal method (such as a warrant), law enforcement has in fact obtained the evidence being offered at trial, provided that the prior illegal search did not influence the decision to seek that warrant or provide information supporting probable cause. 4 Wayne R. LaFave, *Search & Seizure* § 11.4(a) at 378. The inevitable discovery doctrine differs from the independent source doctrine in that it is based on a hypothetical future discovery untainted by the first search. *Id.* Because we need not engage in a hypothetical here, the independent source exception applies.

[¶25]  Under the independent source exception to the exclusionary rule, the proper remedy is to excise the tainted information from the warrant and supporting affidavit and then determine whether the remaining information still establishes probable cause.  *See State v. Rabon*, 2007 ME 113, ¶ 16, 930 A.2d 268.  This process is typically warranted when "a search warrant was issued, but some of the information used to establish probable cause is determined to have been illegally obtained.  If the [judge] would still have had probable cause to issue the warrant without the allegedly unlawfully obtained information, the independent source exception allows the admission of the evidence, and suppression is not justified." *Id.* (citation omitted).

[¶26]  Assuming—without deciding[8]—that the detective's use of the emergency call function was a search under the Fourth Amendment and that a warrant was required, the limited evidence gathered during that search is still admissible because it was properly obtained during the subsequent search of the phone pursuant to a legally obtained warrant supported by probable cause. *See State v. Thibodeau*, 2000 ME 52, ¶ 6, 747 A.2d 596 ("The independent source doctrine, however, permits the introduction of evidence initially discovered

_____

  8  We decline to determine whether the detective's use of the emergency call function on the cellphone constituted a search under the Fourth Amendment because the answer is not necessary to the fair disposition of this case.

during, or as a consequence of, an unlawful search, but later obtained through independent legal activities that are untainted by the initial illegal activity." (quotation marks omitted)).

[¶27]  Notably, in this instance, the detective's use of the emergency call function generated only the number associated with the cellphone, which he used to serve a preservation letter on the cellphone carrier.  After the detective obtained the information to serve a preservation letter, he placed the phone in a metal container, similar to a Faraday bag, to limit its connectivity.  He then began drafting a search warrant for the phone and never relied on the cellphone number or the carrier as a motivation for seeking the warrant or as information supporting probable cause to grant the warrant.  Thus, no information needs to be excised from the probable cause affidavit, and suppression would be inappropriate as there was ample support for the issuance of the warrant to search the phone.  *See Rabon*, 2007 ME 113, ¶ 16, 930 A.2d 268 ("If the magistrate would still have had probable cause to issue the warrant without the allegedly unlawfully obtained information, the independent source exception allows the admission of the evidence, and suppression is not justified.").

**B.    The trial court did not abuse its discretion in denying Carter's Rule 17A motion.**

[¶28]  Carter argues that the trial court abused its discretion by denying his M.R.U. Crim. P. 17A(f) motion in limine seeking to subpoena business records regarding out-of-state purchasers of marijuana from the victims' cultivation business and that the denial limited his ability to present an alternative suspect defense and impeach witnesses. *See State v. Dube*, 2014 ME 43, ¶ 8, 87 A.3d 1219 ("We review a trial court's denial of a motion in limine for an abuse of discretion and its legal conclusions de novo.").  Appellate review for an abuse of discretion involves three questions: "(1) are factual findings, if any, supported by the record according to the clear error standard; (2) did the court understand the law applicable to its exercise of discretion; and (3) given all the facts and applying the appropriate law, was the court's weighing of the applicable facts and choices within the bounds of reasonableness."  *State v. Jeskey*, 2016 ME 134, ¶ 49 n.13, 146 A.3d 127.

[¶29]  Rule 17A(f) allows a defendant seeking the disclosure of privileged or confidential documents from a nonparty to move in limine for a determination from the court before serving a subpoena.  M.R.U. Crim. P. 17A(f).  To succeed on that motion, the party must make a preliminary showing of the following:

(1) the particular documents sought by the subpoena with a reasonable degree of specificity of the information contained therein; (2) the efforts made by the moving party in procuring the information contained in the requested documents by other means; (3) that the moving party cannot properly prepare for trial without such production of the documents; and (4) that the requested information is likely to be admissible at trial. The motion in limine shall be accompanied by a copy of the yet unserved subpoena.

Upon receipt of the motion, the court shall make a preliminary determination that the moving party has sufficiently set forth the relevancy, admissibility, and specificity of the requested documents.

*Id.* If the court determines that the moving party has met the required preliminary threshold, it will direct the clerk to set the matter for a hearing. *Id.* After the clerk issues notice of that hearing, the subpoena must be served on the nonparty. *Id.* Upon receipt of the subpoena, the motion, and the notice, "the subpoenaed individual or entity to whom the subpoena is directed shall either submit the documentary evidence subject to the subpoena for *in camera* review by the court or provide in writing reasons for the failure to submit the documentary evidence for *in camera* review before the date of the hearing." *Id.* Following the hearing, the court may enter any orders necessary to protect the confidentiality, privilege, or privacy of any party or nonparty. *Id.*

[¶30] Here, the trial court rejected the motion at the preliminary stage. In his motion in limine, Carter provided two theories to support the production

of the requested documents: (1) to gain evidence to support an alternative suspect defense and (2) to acquire impeachment evidence to challenge the victims regarding whether their cultivation business engaged in illegal activity. In denying the motion, the court concluded that Carter had not met his burden in demonstrating relevancy, admissibility, and an inability to prepare for trial.

[¶31] Carter's own filing with the trial court acknowledged that despite this threshold requirement, the information he sought was to *investigate further* whether any listed name had a connection to the home invasion, i.e., he was using Rule 17A as a discovery tool, something we have clearly stated that it is not. *State v. Olah*, 2018 ME 56, ¶ 24, 184 A.3d 360 ("Rule 17A(f) is not a discovery device."); *see also State v. Marroquin-Aldana*, 2014 ME 47, ¶ 37, 89 A.3d 519 ("[The defendant] failed to show what specific information the application would contain that would be relevant to his defense. As we have stated, Rule 17 is not a discovery device." (citations omitted)); *State v. Watson*, 1999 ME 41, ¶ 5, 726 A.2d 214 ("The principal purpose of the subpoena duces tecum is 'to facilitate and to expedite the trial . . . [not to] expand the discovery rights of the parties.'" (quoting 1 Cluchey & Seitzinger, *Maine Criminal Practice* § 17.4 at IV–125 (1995))).

[¶32] Regarding the alternative suspect defense, the court discussed the standard for admitting alternative suspect evidence, saying that it "must be both foundationally admissible and, to satisfy the requirements of Maine Rules of Evidence 401 and 403, carry sufficient probative value to raise a reasonable doubt as to the defendant's culpability by establishing a reasonable connection between the alternative suspect and the crime." Here, Carter was one of four intruders; therefore, at best, he could point to an accomplice in the home invasion, but that would likely not meet the admissibility threshold because it does not raise a reasonable doubt regarding his connection to the crimes. *See State v. Daly*, 2021 ME 37, ¶ 19, 254 A.3d 426 ("[A]lternative-suspect evidence is admissible if (1) the proffered evidence is otherwise admissible, and (2) the admissible evidence is of sufficient probative value to raise a reasonable doubt as to the defendant's culpability by establishing a reasonable connection between the alternative suspect and the crime." (quotation marks omitted)).

[¶33] The court went on to reject the defendant's argument that he could not adequately prepare for trial without the evidence because it was necessary to impeach the victims' credibility. The court concluded that the specificity of the defendant's claims in his motion in limine suggested that he had the

necessary information, and the nature of the victims' business was, at best, a collateral matter. Therefore, the court would not permit a trial within the trial regarding collateral impeachment issues. *See* M.R. Evid. 608(b) (giving the court discretion to allow cross-examination but excluding extrinsic evidence offered to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness). The trial court's decision is supported by the rules of evidence and our precedent. *See* M.R. Evid. 608(b); *State v. Coleman*, 2018 ME 41, ¶ 15, 181 A.3d 689 ("The limited opportunity to inquire, on cross-examination, into specific acts by the witness relating to the witness's character for truthfulness or untruthfulness, however, does not open the door to the admission of extrinsic evidence relating to those acts.").

[¶34]  Ultimately, Rule 17A focuses on whether there is a reasonable probability that, based on a defendant's statement of relevancy, admissibility, and specificity, the production of the requested documents could change the outcome at trial. *See Olah*, 2018 ME 56, ¶ 32, 184 A.3d 360; *Pennsylvania v. Ritchie*, 480 U.S. 39, 58 (1987). Here, the trial court correctly understood the law and reasonably concluded that Carter's Rule 17A(f) motion did not satisfy the preliminary standard because it did not meet the requirements as set forth by the applicable rules. *See Daly*, 2021 ME 37, ¶ 19, 254 A.3d 426; *Coleman*,

2018 ME 41, ¶ 15, 181 A.3d 689.  Thus, the trial court did not abuse its discretion.  *See People v. McCray*, 12 N.E.3d 1079, 1081 (N.Y. 2014) ("[W]e have no hesitation in agreeing with the courts below that [the requested documents] are either cumulative or of little if any relevance to the case.").

The entry is:

Judgment affirmed.

---

Michelle R. King, Esq. (orally), Thistle Weaver & Morris, Portland, for appellant Hasahn Carter

Christopher R. Fernald, Asst. Dist. Atty. (orally), Knox County District Attorney's Office, Rockland, for appellee State of Maine

Knox County Unified Criminal Docket docket number CR-2021-659
FOR CLERK REFERENCE ONLY