1999 ME 109

**STATE of Maine**

v.

**Leroy P. TOMAH Jr.**

Supreme Judicial Court of Maine.

Argued April 6, 1999.
Decided July 12, 1999.

Andrew Ketterer, Attorney General, Fernand R. LaRochelle, Asst. Atty. Gen., Donald Macomber, Asst. Atty. Gen. (orally), Augusta, for the State.

Paul F. Macri (orally), Berman & Simmons, Lewiston, for the defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Leroy P. Tomah Jr. appeals from the judgments entered in the Superior Court (Androscoggin County, *Delahanty, J.*) following a jury trial at which he was found guilty of murder in violation of 17–A M.R.S.A. § 201(1)(A) (1983)[1] and robbery (Class A) in violation of 17–A M.R.S.A. § 651(1)(E) (1983).[2] Tomah contends that the trial court erred (1) in excluding as

---

1. Title 17–A M.R.S.A. § 201(1)(A) provides, "A person is guilty of murder if ... [h]e intentionally or knowingly causes the death of another human being ...."

2. Title 17–A M.R.S.A. § 651 provides,

hearsay the written report of an expert regarding blood spatter patterns; (2) in instructing the jury on manslaughter and refusing to instruct the jury on duress; and (3) in several of its other evidentiary rulings. Finding no error or abuse of discretion, we affirm the judgments.

[¶ 2] Tomah was tried together with Brad Chesnel for the murder and robbery of Michael Allen. Allen was brutally beaten and his vehicle and other property were taken.[3] Tomah's version of the murder and the robbery was very different from the version to which Chesnel testified. According to Tomah, he and Chesnel went to a Lewiston motel, where Chesnel arranged to have his friend, Allen, join them. Allen, who had been a Maine State Lottery Megabucks winner, had frequently paid Chesnel for sex, or paid Chesnel to find other males with whom to perform sexual acts. In the motel room, Chesnel appeared to be ingesting cocaine while apparently preparing to engage in sex with Allen. Chesnel then suddenly attacked Allen with a sledgehammer, and continued to beat him. Tomah said that he was present in the motel room, but was not involved in the beating. Following the beating, Chesnel cleaned up some of the blood, and took Allen's rings, his keys, and other belongings. According to Tomah, Chesnel told Tomah that he had to go with him because the motel room was registered in Tomah's name and the police would be looking for him. Tomah explained that he went with Chesnel because he was afraid Chesnel would kill him too.

[¶ 3] Chesnel drove Allen's truck to Old Orchard Beach, where he abandoned it. Chesnel disposed of the weapon and the pillowcase that contained Allen's belongings, and they rented motel rooms, first in Old Orchard Beach, and then in Portland, with Chesnel paying for the rooms. The next day Tomah and Chesnel left by bus for California. After a few days in California, Tomah called authorities in Maine and turned himself in. Initially Tomah told authorities that he was not present in the motel room. He later admitted to police that he was present and observed the beating.

[¶ 4] Chesnel testified to a much different version of the events in this case. According to Chesnel, prior to going to the motel, Chesnel made arrangements for Allen to have a sexual encounter with Tomah. Tomah had asked him "to set him up" with Allen because he needed money to pay his rent. Chesnel told Allen he would call him when they were settled in the motel room. When Tomah and Chesnel arrived at the motel room, Tomah, who had been drinking alcohol that afternoon, continued to drink to try to relax for the sexual encounter. When Tomah told Chesnel he was ready, Chesnel walked to a nearby store to call Allen. Chesnel was expecting to get paid $50 for arranging the encounter and also was hoping to borrow some additional money from Allen so he could leave the State. Upon Allen's arrival, because Tomah was still not relaxed, Allen gave both Tomah and Chesnel cocaine. Tomah took his shirt and pants off and laid them on the bed. Chesnel wanted Allen and Tomah to have some time alone together, so he decided to walk to the store to purchase more beer.

[¶ 5] Because he forgot his identification, Chesnel had to return to the motel room. When he got to the door, he heard screaming. He opened the door and saw blood on the bed and saw Tomah "kneeing" Allen in the face. Tomah told Chesnel that "he

---

1. A person is guilty of robbery if he commits or attempts to commit theft and at the time of his actions: ...
D. He intentionally inflicts or attempts to inflict bodily injury on another; or
E. He or an accomplice to his knowledge is armed with a dangerous weapon in the course of a robbery as defined in paragraphs A through D.

3. According to Dr. Henry Ryan, the Chief Medical Examiner, the victim's jaw, nose, and facial bones were fractured and his face, head, hands, legs, and back contained many abrasions and lacerations. Brain tissue was seeping through fractures in his skull. In Dr. Ryan's opinion, the injuries were inflicted with a fist as well as with a steel weapon such as a tire iron. The cause of death was blunt head injury.

couldn't handle it." Chesnel got towels from the bathroom to try to clean the blood. Tomah continued to strike Allen because Allen was "making loud noises." Tomah stepped on Allen's throat then took a crow bar and struck Allen in the head. Tomah told Chesnel to take Allen's rings, keys, and identification and go outside to start Allen's truck.

[¶ 6] Chesnel and Tomah were tried together in Superior Court on charges of murder and robbery. The jury found both men guilty on both counts. Chesnel was sentenced to life in prison. Tomah received a prison sentence of forty-seven years on the murder charge and a concurrent sentence of twenty-seven years for robbery. This appeal by Tomah followed.

### I.

[¶ 7] Tomah first contends that the court erred in refusing to admit in evidence a forensic report of Dr. Marilyn T. Miller, an expert on blood spatter patterns. Tomah retained Dr. Miller to corroborate his defense "that he had nothing to do with the murder, that he sat, mesmerized, in a chair in the hotel room and watched Brad Chesnel beat Michael Allen to death." The report concludes that the fact that there was considerably less blood on the pants worn by Tomah than on the pants worn by Chesnel is supportive of Tomah's version of the events, that Chesnel was responsible for the brutal murder of Allen, and that Tomah was a mere observer. Before the beginning of the fourth day of trial, Tomah's attorney informed the trial court that Dr. Miller, whom Tomah had scheduled to testify, "had a better offer from an attorney in New York City" and that she decided to appear in a court case in New York instead of attending Tomah's trial, at least at the time she was scheduled to testify. Tomah moved to continue the trial until the following Friday when Dr. Miller said she

could be available. Tomah also moved for the admission of Dr. Miller's written report as an exception to the hearsay rule because of Dr. Miller's unavailability. The trial court denied both motions: [4]

> Even though [Dr. Miller] is unavailable, I don't think the report falls within the exception to the hearsay rule as it is intended, in addition to the fact that an expert opinion like this should not be admitted into evidence without the opportunity of cross-examination and for any theories to be put to the test.

In denying the motion to continue, the court noted the late date on which the report was filed. Tomah contends that Dr. Miller's report should have been admitted pursuant to the business record exception to the hearsay rule. We review a trial court's decision to exclude evidence for an abuse of discretion or clear error. *See State v. MacDonald,* 1998 ME 212, ¶ 7, 718 A.2d 195, 198.

[¶ 8] " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R. Evid. 801(c). Either written or oral statements can fall within the definition of hearsay. *See* M.R. Evid. 801(a). Because it is a written statement made outside of the courtroom prior to trial that Tomah sought to offer in evidence to prove the truth of its contents, and to support its conclusion that the blood spatter patterns illustrate that Tomah did not participate in the beating, Dr. Miller's report falls within the definition of hearsay. *See* M.R. Evid. 801(c).

[¶ 9] Evidence that is otherwise hearsay can still qualify for admission pursuant to an exception to the hearsay rule. *See* M.R. Evid. 803. A record of regularly conducted business is one of those recognized exceptions. *See* M.R. Evid. 803(6).[5] Properly authenticated business records

---

4. The court's denial of Tomah's motion to continue was within its discretion. *See State v. Dechaine,* 572 A.2d 130, 132 (Me.1990).

5. M.R. Evid. 803 provides:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . .
>
> (6) **Records of Regularly Conducted Business**. A memorandum, report, record, or

are admissible pursuant to Rule 803(6) as an exception to the hearsay rule because they are thought to be sufficiently trustworthy if it is demonstrated that they are kept in the regular course of a business or profession, separate and distinct from any advocacy needs or pressures that may arise from litigation and affect accuracy or trustworthiness.[6] "The reliability of the records is thought to rest on the systematic businesslike way they are kept." Field & Murray, *Maine Evidence* § 803.6 at 433 (4th ed.1997).

[¶ 10] Forensic expert reports are the antitheses of the business records meant to be addressed by Rule 803(6). They are advocacy reports, expressly prepared for litigation to support one party to the litigation. Although the preparation of such a record is in the course of the expert's business of advocacy support, the preparation is not routine and the record is not of the type that is contemplated by the business records exception to the hearsay rule set out in Rule 803(6). Indeed, that it is prepared in anticipation of litigation is a common reason for a finding that a report lacks trustworthiness. *See State v. Therriault*, 485 A.2d 986, 996 (Me.1984).

[¶ 11] Tomah, however, relies on *Therriault*, contending that *Therriault* stands for the proposition that reports of absent experts are admissible as business records.

We disagree. In *Therriault*, the defendant was tried twice.[7] At the first trial, a forensic report, that was prepared by a State Examiner at the State Police Crime Laboratory and that noted the physical results of a visual observation, chemical test, and microscopic examination, was offered by the defense and admitted without the State's objection. *See id.* at 991. Apparently, neither side thought it important to question the author about the report at the first trial. Subsequent to the first trial, the individual who prepared the report died, and the State successfully objected to the use of the report at the second trial. We vacated the conviction based on the exclusion of the State Crime Lab Report. *See id.* at 997.

[¶ 12] Our reliance on Rule 803(6) in *Therriault* was based on the absence of any dispute about the report's reliability. It was a State Crime Lab report that exculpated the defendant and was used, without objection, at the prior trial. *See id.* at 991. The State appeared to have seized upon the unavailability of the person who prepared the report to object to the report's admissibility because the report was not favorable to the State's case. *Therriault* does not come close to creating a business records exception to the hearsay rule for expert reports. It is based on unique facts, and we decline to extend it beyond its facts.[8]

---

data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regular conducted business, and if it was the regular practice of that business to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness....

6. A proponent of a business record must show, through the testimony of a qualified witness, that:
 (1) the record was made "at or near the time" of the events reflected in the record by, or from information transmitted by, a person with personal knowledge of the events recorded therein; (2) the record was

kept "in the course of a regularly conducted business"; (3) it was the regular practice of that business to make records of the type involved; and (4) no lack of trustworthiness is indicated from the source of information from which the record was made or the method or circumstances under which the record was prepared.
*State v. Hager*, 691 A.2d 1191, 1193 (Me.1996) (citations omitted).

7. The first trial resulted in a hung jury. *See Therriault*, 485 A.2d at 989.

8. The four to three majority opinion in *Therriault* has been subject to substantial criticism:

 The ruling, from which three justices dissented, is a troublesome one. The Maine State Police Crime Laboratory is a public agency. The public records exception, Rule

[¶ 13] Moreover, even if *Therriault* could be construed as Tomah urges, it would be of no help to him here. The circumstances in this case are substantially different from those in *Therriault* and compel the exclusion of Dr. Miller's report. The trustworthiness and reliability of the report is not free from doubt. Dr. Miller was an expert hired by Tomah. She prepared the report, as an advocate, specifically for the purpose of its use at Tomah's trial. She had not viewed the blood spattered pants on which she based her report, relying instead on photographs and statements made by Tomah and Chesnel. Moreover, Dr. Miller, who was the authenticating witness for the report, refused to appear at Tomah's trial at the appointed time. In addition, although Tomah sought to have Dr. Miller's report admitted as a business record, his co-defendant Chesnel, whom the report inculpated and who had a constitutional right to cross-examine the preparer of the report, objected to its admission. Dr. Miller's report, prepared by an expert specifically for trial, is not a business record within the meaning of Rule 803(6) and was properly excluded by the court.

## II.

 [¶ 14] Tomah also contends that the trial court erred in instructing the jury on manslaughter because the crime was not generated by the facts presented during the trial.[9] A trial court must not instruct a jury to consider a lesser included offense "unless on the basis of the evidence there is a rational basis for finding the defendant guilty of that lesser included offense ...."

17–A M.R.S.A. § 13–A(1) (1983). If a rational basis for finding the defendant guilty of the lesser included offense exists and a party has requested the instruction, the trial court is required to include the instruction. *See id.* Both the State and Chesnel requested the instruction.

[¶ 15] Manslaughter is a lesser included offense of murder. "A person is guilty of manslaughter if that person ... [r]ecklessly, or with criminal negligence, causes the death of another human being[.]" 17–A M.R.S.A. § 203(1)(A) (Supp.1998). A person is guilty of murder if that person "intentionally or knowingly causes the death of another human being[.]" 17–A M.R.S.A. § 201(1)(A). Thus, the only difference in the elements of manslaughter and intentional and knowing murder is the state of mind of the accused. Evidence that the accused was intoxicated by alcohol or drugs "may raise a reasonable doubt as to the existence of a required culpable state of mind" sufficient to convict the accused of manslaughter rather than murder. 17–A M.R.S.A. § 37 (1983); *see State v. Wood,* 662 A.2d 908, 912–13 (Me.1995).

 [¶ 16] Although the evidence in the record is conflicting, the record does include testimony from several witnesses that Tomah drank a significant amount of alcohol in the hours preceding Allen's death and had taken cocaine. Depending on which witnesses the jury found credible, the jury could have concluded that Tomah had consumed a sufficient amount of alcohol or drugs to preclude him from acting

---

803(8), specifically excludes 'investigative reports by police and other law enforcement personnel.' It is hard to logically justify how terming the activity of the Maine State Police Crime Laboratory as a 'regularly conducted business' should lead to a different result. It appears that the majority of *Therriault* has sought to create a new exception to the hearsay rule for governmental investigative reports when offered by the defendant. The question remains, however, whether or not it would have been preferable to have amended Rule 803(8) rather than attempt to find this exception within the language of Rule 803(6).

Field & Murray, *Maine Evidence* § 803.6 at 436–37 (4th ed.1997); *see Therriault,* 485 A.2d at 998–99 (*Wathen, J.,* dissenting).

9. The State contends that Tomah did not preserve his objection to the manslaughter charge. Although Tomah's objection to the instruction could have been clearer, the trial court was aware of Tomah's prior expressed reservations about the manslaughter instruction, and informed Tomah that it was giving the instruction irrespective of Tomah's position because both the State and Chesnel requested the instruction.

with the culpable state of mind required to find him guilty beyond a reasonable doubt of murder. Accordingly, the manslaughter instruction was not clear error. Moreover, because the trial court instructed the jury to decide first whether Tomah was guilty of murder beyond a reasonable doubt before they addressed the manslaughter charge, and the jury, after deliberating, found Tomah guilty of murder, any error in instructing the jury on manslaughter is harmless. *See State v. Bowman,* 588 A.2d 728, 731, 732 (Me.1991) (error in manslaughter instruction is harmless because sequence of instruction required jury to first determine whether defendant was guilty of murder and jury so found).

## III.

[¶ 17] Tomah further contends that he was entitled to have the jury instructed on the defense of duress. Tomah testified that after the beating occurred, Chesnel told him that he had to leave with Chesnel because the motel room was registered in Tomah's name and the police would be looking for him. When asked by his attorney what he was thinking at the time and why he accompanied Chesnel, Tomah responded, "Well, I figured, well, if I don't go, I could be laying down on the floor too. He could use that weapon on me." The trial court denied Tomah's request for a duress instruction.

[¶ 18] If a statutory defense is generated by the evidence, viewed in the light most favorable to the defendant, the failure of a trial court to give a requested jury instruction on that defense is error. *See State v. Hernandez,* 1998 ME 73, ¶ 7, 708 A.2d 1022, 1025; *State v. Sullivan,* 1997 ME 71, ¶ 6, 695 A.2d 115, 117. Title 17–A M.R.S.A. § 103–A(1) (1983) provides:

It is a defense that, when a defendant engages in conduct which would otherwise constitute a crime, he is compelled to do so by threat of imminent death or serious bodily injury to himself or anoth-

er person or because he was compelled to do so by force.

Duress exists only if, viewed objectively, "the force, threat or circumstances are such as would have prevented a reasonable person in the defendant's situation from resisting the pressure." 17–A M.R.S.A. § 103–A(2); *see State v. Glidden,* 487 A.2d 642, 644–45 (Me.1985).

[¶ 19] A threat that serves the basis of a duress defense must be real and specific, and the specific harm that is feared must be imminent. *See* 17–A M.R.S.A. § 103–A(1); *State v. Larrivee,* 479 A.2d 347, 351 (Me.1984). A "veiled threat of future unspecified harm" is not sufficient to raise the defense of duress. *See Larrivee,* 479 A.2d at 349, 351 (threat from dangerous and violent friend that defendant would be "very sorry" if he did not commit robbery is not sufficient to warrant jury instruction on duress defense).

[¶ 20] In this case, viewing the evidence in a light most favorable to Tomah, it is insufficient to support a finding that Tomah, if he played a role in the beating, was compelled to beat and kill Allen out of fear of Chesnel. Nor was there a showing that Tomah was objectively compelled to accompany Chesnel during his getaway because he feared Chesnel's violence. There was no evidence that Chesnel specifically threatened to harm Tomah if he did not help Chesnel in the beating or in the escape. *Cf. State v. Knights,* 482 A.2d 436, 442 (Me.1984) (evidence that defendant threatened by nephew with severe beating or death if defendant did not set fires was sufficient to warrant instruction on duress defense in trial for arson). Chesnel suggested that Tomah leave with him after the beating because the police would find Tomah and think he was responsible for the death. Such a statement does not lead to specific fear of imminent harm and would not lead a reasonable person to feel pressure to commit further crimes. The defense of duress was not generated.[10]

10. Although Tomah testified that he was afraid of Chesnel, he also testified that when Chesnel asked him to clean up the blood, he refused to assist Chesnel and threw the towel Chesnel gave him onto the floor.

[¶ 21] We have reviewed Tomah's other contentions concerning the trial court's evidentiary rulings and find them to be without merit.

The entry is:

Judgments affirmed.

SAUFLEY, J., with whom WATHEN, C.J. joins, concurring.

[¶ 22] Although we concur with the result in this case, we would explicitly overrule Therriault. Bluntly put, *Therriault* represents a classic instance of bad law created in search of good results.

[¶ 23] The Court's declaration that "*Therriault* does not create a business records exception to the hearsay rule for expert reports" mistakes the import of that decision and results in a lack of clarity in this important area. The laboratory report in *Therriault* consisted of an analysis of tissue samples taken from the body of the alleged victim and the defendant. *See* 485 A.2d at 991. The report reviewed the evidence presented and recorded specific findings resulting from the examination of the samples. Although the report was admitted without objection at the first trial, the State's objection to its admission at the second trial placed the defendant in the position of demonstrating its admissibility. Because the author of the report had died in the interim, the defendant was unable to present a witness to establish that the report met the requirements of the business records exception to the hearsay rule. *See id.* at 993.

[¶ 24] Notwithstanding the nature of the expert's report and the defendant's inability to bring the report within the strictures of Rule 803(6), we concluded in *Therriault* that "it was error for the presiding justice to have ruled that the laboratory report was inadmissible under the business records exception to the hearsay rule." *Id.* at 997.

[¶ 25] The *Therriault* opinion can only be understood as attempting to address a fundamental lack of fairness that the Court perceived in the State's belated objection to the report's admission. In fact, absent the discussion of the business records exception, the Court's ruling merely effectuates the purposes of another exception to the hearsay rule related to testimony given at prior proceedings. Because the report was, in effect, offered in lieu of testimony at the first trial, at a time when the author would have been available to authenticate and explain his findings and for cross-examination, the report may have been admissible under Rule 804(b)(1).

[¶ 26] Unfortunately, we relied on the business records exception to achieve a result more fair to the defendant, and in so doing created significant confusion about the applicability of that exception. In declining to overrule *Therriault* today, and in addressing only those expert reports it defines as "advocacy reports," the Court leaves open the possibility that other expert reports may be admissible under Rule 803(6).

[¶ 27] We would hold that an expert's report, regardless of when or for whom it was prepared, and regardless of which party offers the report, is not admissible under the business records exception. *See* M.R. Evid. 803(6). Such reports often contain extensive compilations of information which would not otherwise be admissible, just as the expert's opinion will often be based in part on information that is inadmissible. Reliance by the expert on such information does not make that information independently admissible "at the behest of the proponent of the opinion." RICHARD H. FIELD & PETER L. MURRAY, MAINE EVIDENCE § 703.2, at 358 (4th ed.1997) (citing *Warren v. Waterville Urban Renewal Authority*, 235 A.2d 295 (Me. 1967)). The same is true regarding the opinions of another expert that may have formed the basis of the authoring expert's opinion. We have made it clear that a party may not offer the opinion of one expert by presenting another expert at trial and asking the testifying expert to articulate the opinion of the expert who is not present. *See Henriksen v. Cameron*, 622 A.2d 1135, 1144 (Me.1993).

[¶ 28] Moreover, by definition, an expert's report includes the opinions of the expert, whose testimony must meet the requirements of Rules 702 and 705.[11] The admission of the expert's opinion under the business records exception would eviscerate the requirements imposed by these rules.

[¶ 29] While the Court today generally recognizes these principles, the failure to overrule *Therriault* leaves open a door that should be firmly closed. We would explicitly overrule *Therriault's* application of the business records exception.

**11.** *See State v. Williams*, 388 A.2d 500, 504 (Me.1978); *cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael*, — U.S. ——, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (addressing generally application of Rule 702 of the Federal Rules of Evidence).