MAINE SUPREME JUDICIAL COURT                                  Reporter of Decisions

Decision:    2016 ME 134
Docket:      Pen-15-315
Argued:      May 4, 2016
Decided:     August 16, 2016

Panel:       SAUFLEY, C.J., ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

ROXANNE JESKEY

HUMPHREY, J.

[¶1]  Roxanne Jeskey appeals from a judgment of conviction for the intentional or knowing murder and depraved indifference murder of her husband, Richard Jeskey, entered in the Superior Court (Penobscot County, *Hunter, J.*) after a bench trial.  Roxanne argues that (A) there was insufficient evidence to support the court's finding beyond a reasonable doubt that she was guilty of knowing or intentional murder or depraved indifference murder; (B) the court erred by not finding her not guilty by reason of insanity; (C) the court erred by not considering the lesser included offense of manslaughter;

2

and (D) the court abused its discretion by denying her motion for a new trial.[1] We affirm the judgment.

## I. BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the trial record supports the following facts, which were found by the Superior Court in a comprehensive decision following a seven-day bench trial.  *See State v. Weaver*, 2016 ME 12, ¶ 2, 130 A.3d 972.

[¶3]  Roxanne and Richard "Rick" Jeskey were married and living together in an apartment in Bangor in June 2011.  Rick was employed full time as a freight delivery truck driver, and Roxanne regularly provided care for her young grandchildren at their apartment.  In 2003, Roxanne underwent a resection of the anterior right temporal lobe of her brain to mitigate intractable seizures.  The surgery left Roxanne with some cognitive limitations, such as disorganized thinking and impaired processing, as well as personality, emotional, and behavioral changes, such as being quick to anger and experiencing stronger and more frequent impulsive reactions.  Roxanne

---

[1]  Roxanne also asserts that the court abused its discretion by limiting the use of information that she related to a doctor during her forensic evaluation.  We do not find this argument persuasive and do not discuss it further.

also suffers from heart disease and may suffer from post-traumatic stress disorder associated with childhood abuse.

[¶4] A husband and wife lived in the apartment next door to, and were friends with, the Jeskeys. They reported that the Jeskeys frequently argued and that Roxanne often described and displayed bruising on her arms, legs, and torso, but Roxanne provided no explanation for them other than that she was on blood thinners for her heart condition and had a history of bruising easily.

[¶5] Both the Jeskeys and the couple next door were home in the late afternoon and evening on Sunday, June 12, 2011. Roxanne called the wife around 6:00 p.m., when the couple was having dinner, and the wife spoke with her briefly. The wife fell asleep watching television and was awoken about an hour later by loud banging or slamming sounds coming from the Jeskeys' apartment. The wife called Roxanne to see if everything was all right. Roxanne told her that everything was fine and that they did not need any help. At ten or twenty minute intervals throughout the course of the evening until midnight, the couple heard loud banging, slamming sounds, bumps, and thuds coming from the Jeskeys' apartment.

4

[¶6] The wife and Roxanne exchanged several more phone calls that evening, and, at some point, Roxanne told the wife that she and Rick were fighting because she had discovered that he had been speaking with a former girlfriend on the phone, and she was mad.[2] The wife testified that she never heard any voices that night despite Roxanne's assertion that she and Rick were fighting. Roxanne also told the wife that Rick slapped her across the face and asked what she "planned to do about it" when Roxanne confronted him about the former girlfriend. Roxanne explained that, in response, she used a pickaxe to damage Rick's motorcycle[3] that was parked near the apartment and had then gone back inside to hit him in the face with a plastic bat.

[¶7] When the wife asked if Rick was okay, Roxanne told her that she had given him a bloody nose and had loosened a tooth but that he was fine, and if he really needed an ambulance, Roxanne said, she would let the wife know. During one call, in response to the wife's repeated offers of assistance, Roxanne specifically asked her not to call an ambulance. Roxanne stated that she was "pissed off" and that she could "be your best friend or your worst fucking enemy, and that's what [Rick] picked." Roxanne told the wife that Rick

---

[2] Roxanne also made several calls to the former girlfriend from Rick's cell phone, and Rick had called the woman once in the early evening and once again at around 9:30 p.m.

[3] Roxanne had cut the brake lines and spark plug wire, pulled out wires, and loosened the air filter and wire harness box.

was getting cleaned up and taking a bath. She ended the phone call by telling the wife that Rick was calling her from the bathroom, though the wife testified that she did not hear him.

[¶8] Shortly after 11:30 p.m., the husband heard a very loud thud coming from the Jeskeys' apartment, and he was so concerned that he went next door, in the pouring rain, to find out for himself if everything was all right. Roxanne came to the door but only opened it a crack to speak with him. She did not invite him in. He stayed at the door less than a minute, but he did not see anything out of the ordinary regarding Roxanne's appearance, and she assured him that all was well. Roxanne called the couple once more and thanked the husband for coming over; that was the last contact they had with her until the following day. Both husband and wife stated that on each occasion they spoke with Roxanne, she appeared to be appropriately responsive, outwardly calm, and coherent.

[¶9] Later that night, at approximately 2:30 a.m. on June 13, 2011, Roxanne called Rick's place of employment and spoke with the night supervisor. She told him that Rick was very ill and that the two of them were driving home from the hospital where they had just spent the entire evening, and therefore Rick would not be going to work that morning. Roxanne also

asked for the supervisor's name so that she could write it down, which the supervisor considered odd because he and Rick had worked together for years, and Roxanne claimed that Rick was sitting next to her in the car.

[¶10] That morning, around 8:30 a.m., Roxanne called 9-1-1 and reported that Rick was unconscious and not breathing. Emergency services and law enforcement arrived within minutes, found Rick lying in the bathtub, and quickly determined that he was dead. An officer with the Bangor police department arrived on the scene, and, as he began to interact with Roxanne, he noted that she appeared weak and was breathing rapidly. She volunteered that she had gotten in a huge fight with her husband the night before and that she had hit him with her grandchild's plastic bat—part of which the officer subsequently found in the garbage can. She admitted to the officer that she lied to Rick's supervisor about having been at the hospital. She also told him that she found Rick in the tub when she went to take a shower that morning.

[¶11] As she was speaking with the officer, she made repeated requests for medical personnel to "get a pulse" from Rick, and, when informed that he was deceased, she began to strike the officer's chest repeatedly. He took hold of her arms and held them away from him. Following her outburst, Roxanne's breathing became more labored, and she began to clutch her chest. As EMTs

walked her to the door, she stated that Rick had pushed her down, and she displayed what to the officer's observation seemed like aged bruises on her arms and legs. Roxanne was taken to the hospital for evaluation. She spent approximately four hours in the emergency department and, during that time, interacted with one particular nurse for about twenty minutes.

[¶12] That nurse described Roxanne's demeanor at the hospital as calm and matter-of-fact, and testified that Roxanne was consistently oriented to person, place, time, and situation. The nurse noted that Roxanne had no difficulties communicating and that Roxanne volunteered to the nurse that she had "hit [Rick] again and again and again," that she had cut him, and that "he had made quite a mess and that she had to clean it up." At no time did Roxanne complain to the nurse of any specific injuries nor did she claim that Rick had hit her. The nurse observed bruises on Roxanne's body and the back of her hands, consistent with the use of blood thinners.

[¶13] When the wife went to the hospital to visit, Roxanne gave her a rambling explanation of what happened, reporting that Rick had been quite drunk, and that he had repeatedly fallen down and kept banging his face to the point that his eye came out. Roxanne also told the wife that Rick took the

8

towel rack off the wall and attempted to strike her with it. She repeatedly told the wife that "she didn't do it," and she only wanted to "hurt [him] a little bit."

[¶14]  Upon investigation of the Jeskeys' apartment, law enforcement found Rick's unclothed body in the bathtub with a cellphone, broken in two, on his chest, a ripped shower curtain, a broken wooden towel rack and a brown leather belt lying on the bathroom floor; a pair of needle-nose pliers and a razor without the blade on the bathroom counter; and a broken piece of a metal broom handle, a cigarette lighter, and a bent metal towel rod also lying on the floor. In addition, there were impact, cast-off, and transfer blood patterns[4] in the shower; on the bathroom door, floor, walls and counter; on the hallway carpet; and on the toolbox in the bedroom closet. The washing machine and a laundry basket were full of wet laundry with red-brown stains on several of the articles. The bathroom appeared as though it had been cleaned up.

[¶15]  The medical examiner testified that Rick sustained multiple injuries to the front, both sides, and back of his head; a deep laceration across the bridge of his nose and a broken nose; a subarachnoid hemorrhage near

---

[4] An officer with the Bangor Police Department's Criminal Investigation Division testified that "cast-off is basically blood that is flung from or released from a moving object." "Impact" is "the striking of blood with an object. Liquid blood, wet blood." "Transfer" is a "bloodied surface coming in contact with another surface."

the surface of his brain; multiple cuts and tear wounds to his forehead and scalp; injuries all around his eyes and a cutting injury to his left eyelid, the globe of his left eye sliced open in a manner that allowed the vitreous fluid to escape; puncture wounds to his arms[5]; significant bruising around his entire neck; a fractured hyoid bone; pinpoint hemorrhages inside his lips suggesting that he was strangled or choked; multiple torso injuries on his front and left side, including three rib fractures; a burn to his left nipple; punctures, bruises, and cuts to the exterior of his penis; injuries to his scrotum that were caused when something[6] was thrust through the scrotal sac far enough to reach the pelvic floor and grab onto and damage the mesentery and tear a hole in the small bowel; cuts and lineal abrasions to the anus; and bruising, cuts, tears, and abrasions to the forearms, hands, thighs, and calves. Rick also had alcohol and sleeping pills in his system, which may have impaired or incapacitated him, but the court specifically found that he was "conscious throughout his ordeal."

[¶16] On June 22, 2011, Roxanne was charged with intentional or knowing murder or, in the alternative, depraved indifference murder in

---

[5] The court found that these wounds were caused by blows from the wooden towel rack, which had protruding screws.

[6] The court found that Roxanne caused the injuries to Rick's genitals using needle-nose pliers and the injuries to his anus using the metal broom handle.

violation of 17-A M.R.S. § 201(1)(A)-(B) (2015). On June 24, 2011, the State filed a motion for a forensic evaluation, stating, "The circumstances of the case strongly suggest that the defendant may have mental illness issues, including neuropsychological issues." On July 27, 2011, the grand jury returned an indictment charging Roxanne with one consolidated count of intentional or knowing and/or depraved indifference murder.

[¶17] Roxanne pleaded not guilty at her arraignment in September 2011 and, after holding a hearing on October 31, 2011, the court (*A. Murray, J.*) granted the State's motion for a forensic evaluation, ordering a mental examination to determine Roxanne's competency, whether she suffered from insanity or an abnormal condition of the mind, and whether there existed other mental conditions relevant to issues that might arise at trial, such as battered woman syndrome. In May 2012, at the State's request, the court also ordered a neuropsychological examination to be conducted by the State Forensic Service. Shortly thereafter, Roxanne was ordered admitted to Riverview Psychiatric Center for sixty days.

[¶18] On April 10, 11, 12, and 16, 2013, the court held the first of two competency hearings. Four expert witnesses testified. Dr. Riley, a clinical neuropsychologist, opined that Roxanne had all the skills necessary to

demonstrate competency if she chose to exercise those skills. Drs. Doiron, a board-certified clinical neuropsychologist, and Lorenz, a clinical psychologist, opined that she did not. And Dr. O'Grady, a clinical and forensic psychologist, opined that Roxanne's "skills related to competency fell somewhere between her functioning prior to arrest"—which included being entrusted with the care of young children, volunteering at school, driving, functioning in the community—"and not being competent." In its May 2013 order, the court noted that Roxanne's presentation to the four experts was "markedly different than her presentation to others." The court stated that, although it was convinced that Roxanne "has some impairments, and is further convinced that stress may exacerbate those impairments," it concluded, by a preponderance of the evidence, that she was competent to stand trial because she was able to cooperate with counsel to conduct a defense in a reasonable manner.

[¶19] On May 24, 2013, Roxanne entered a plea of not criminally responsible by reason of insanity, 17-A M.R.S. § 39 (2015), and waived her right to a jury trial.[7] On November 8 and 12, 2013, Roxanne and the State each moved for a second competency evaluation alleging a change in

---

[7] Also on that day, Roxanne moved for the recusal of Justice Murray on the ground that the court found that Roxanne was "malingering," i.e. intentionally presenting symptoms to avoid consequences, which Roxanne claimed raised a question as to whether the court was prejudicing Roxanne's credibility. The motion to recuse was granted, without comment.

12

circumstances based on a new report by Dr. Lorenz, and the court (*Hunter, J.*) granted the motion.

[¶20]  On December 10 and 11, 2013, the court held a second competency hearing and took testimony from the same panel of four doctors. This time, Drs. O'Grady's and Riley's testimony supported the conclusion that Roxanne *did* have the ability to cooperate and assist in her defense, but Drs. Doiron and Lorenz testified that she did *not* have the ability to assist.  In an order dated December 13, 2013, the court noted that the experts shared a view that Roxanne suffered from low cognition, post-traumatic stress disorder, and "other significant mental health issues that adversely affect[ed] her level of functioning."  The court appropriately took into account its observations of Roxanne during the course of the proceedings and other evidence presented of her behavior in jail for five months and concluded, again, that she was competent to stand trial.

[¶21]  A seven-day bench trial commenced on December 16, 2013.  On December 20th, following the State's case-in-chief, the court granted an extended recess to give Roxanne time to decide whether she wanted to testify. On January 2, 2014, during the break, the court held a video conference with Roxanne, her counsel, and the State's attorneys.  Roxanne's counsel alleged

that she was suffering from an active psychotic disorder that was "seriously interfering with her ability to assist counsel in anything close to a normal relationship" and requested that she be evaluated by a psychiatrist to address her significant medication and treatment issues that affected, counsel claimed, her ability to make the decision whether or not to testify.

[¶22]  The State contended that Roxanne had been given several opportunities to review trial materials and availed herself of many of those opportunities, and the prison staff reported that she adamantly denied suicidal or homicidal ideations, plan, or intent, and that she did not endorse perceptual disturbances.  The court stated that there was "nothing to suggest that Ms. Jeskey does not enjoy the competence – the level of competence that the Court had found in its most recent order, and, therefore, [it was] not inclined to order any further evaluations or any testing such [as] has been suggested by the defense here."

[¶23]  When trial re-commenced on January 6, Roxanne presented one witness in her defense, Dr. Doiron, who testified that Roxanne suffered from post-traumatic stress disorder and schizoaffective disorder, which, when coupled with her cognitive and mood changes following her brain resection, resulted in her inability to properly perceive the situation the night of the

14

murder. He testified that Roxanne had been experiencing a dissociative state that prevented her from being able to form the requisite culpable state of mind for knowing and intentional murder. In contrast, the State's rebuttal witness, Dr. O'Grady, testified that she did not observe anything during the course of her interaction with Roxanne that would support Dr. Doiron's conclusion that Roxanne was experiencing a dissociative state.

[¶24] In an order dated May 30, 2014, as to the charge of knowing or intentional murder the court found, beyond a reasonable doubt, that (1) Roxanne inflicted injuries upon Rick Jeskey that ultimately lead to his death; (2) what Roxanne did to Rick was for the purpose of hurting him, and therefore her conduct was the product of her own free choice; and (3) she intentionally caused Rick's death. As to the charge of murder based on depraved indifference, the court found that "[a]ny one of [the injuries Rick sustained] standing alone manifests a depraved indifference to the value of human life. Taken together they reflect a monstrous savagery and cruelty that defies comprehension." The court also found that this was "not a case of criminally negligent manslaughter," despite that being a lesser included charge.

[¶25]  As to evidence bearing on Roxanne's defenses of self-defense and justified use of deadly force based on her allegations of mutual aggression between her and her husband, the court stated that, even under Roxanne's view of the evidence, the State had proved the absence of self-defense beyond a reasonable doubt.  Specifically, the court stated, "The evidence is clear to this court that [Roxanne's] use of force greatly exceeded the bounds of objective reasonableness and simply cannot be viewed as a 'reasonable degree' of force."  The court also found "that [Roxanne] did not actually believe that what she did to Mr. Jeskey was necessary because it is clear to this court that [she] continued to use force against [him] long after he had become unresponsive and therefore long after any threat of imminent use of force against her had ended."  Further, the court found that there was "no credible evidence that would have, at any time, justified [Roxanne's] use of deadly force against" Rick.

[¶26]  As to Roxanne's contention that she should be held not criminally responsible for her conduct by reason of insanity, the court found that she failed to prove, by a preponderance of the evidence, "that at the time of her actions, she lacked substantial capacity to appreciate the wrongfulness of her conduct because of a severe abnormal condition of the mind that grossly and

demonstrably impaired her perception or understanding of reality," despite the fact that she suffered from "a variety of mental health issues." The court found that, because Roxanne was coherent in her communications with the neighbors, Rick's supervisor, a police officer, and the nurse, and because she made several phone calls throughout the course of the evening, she was coherent and "capable of reality[-]based, goal[-]directed behavior."

[¶27] The court also concluded that Roxanne had demonstrated appreciation for the wrongfulness of her conduct by her request that the wife *not* call an ambulance; by her "opening the door a crack" and subsequent failure to invite the husband in when he came over to check on her; by her deceptive call to Rick's supervisor; and by her efforts to clean the bathroom and launder the clothing. The court concluded that, "at the time she was causing fatal injuries to Mr. Jeskey, [Roxanne] did not suffer from the kind of severe abnormal condition of the mind that would be sufficient to shield her from criminal responsibility under Maine law." The court entered a finding of guilty on May 30, 2014.

[¶28] On June 9, 2014, Roxanne filed a motion for a new trial on the ground that "it was manifestly unjust for [her] to be tried while she was actively psychotic" because it was impossible for her to be adequately

counseled and make a "truly voluntary and informed decision about . . . whether to testify in her own defense." She implied that she was entitled to a new trial because her new anti-psychotic medication had markedly improved her overall mental health by the time she made the motion. On June 12, 2014, the court denied the motion, noting that, other than Roxanne's counsel, no one, including the court, had observed any evidence of active psychosis prior to or during the trial. The court stated that it was "aware of no recognized right for a criminal defendant to be at some specified state of optimum physical or mental health before being required to stand trial. That they might be made *better* able to participate in trial proceedings through medical intervention does not appear to be a recognized basis for granting a new trial."

[¶29] On June 27, 2014, the court held a sentencing hearing and sentenced Roxanne to fifty years in prison. Roxanne timely appealed.

## II. DISCUSSION

### A. Murder Convictions

#### 1. Knowing or Intentional Murder Conviction

[¶30] Roxanne first argues that there was insufficient evidence to support the court's finding beyond a reasonable doubt that she committed intentional or knowing murder. We review the evidence, and all reasonable

inferences that may be drawn from the evidence, in the light most favorable to the court's judgment to determine whether the trial court rationally could have found each element of the charged offense proved beyond a reasonable doubt. *See State v. Jones*, 2012 ME 88, ¶ 7, 46 A.3d 1125.

[¶31] A person is guilty of murder if the person intentionally or knowingly causes the death of another human being or engages in conduct that manifests a depraved indifference to the value of human life that in fact causes the death of another human being. 17-A M.R.S. § 201(1)(A)-(B). "In order to prove the defendant guilty of murder, the State must prove beyond a reasonable doubt" that (1) the victim is dead; (2) the defendant caused his death; (3) the defendant's conduct was voluntary;[8] and (4) the defendant acted knowingly or intentionally.[9] Alexander, *Maine Jury Instruction Manual,* § 6-62 at 6-123 (2016 ed.).

---

[8] Voluntary conduct means "that the defendant's actions that caused the death were the result of the defendant's conscious choice and not the result of reflex, convulsion or some other nonvoluntary act. . . ." Alexander, *Maine Jury Instruction Manual,* § 6-62 at 6-123 (2016 ed.).

[9] "A person causes death intentionally if it is that person's conscious object to cause death. A person causes death knowingly if that person is aware that it is practically certain that his/her conduct will cause death." Alexander, *Maine Jury Instruction Manual,* § 6-62 at 6-123.

[¶32]   Relying on the law of abnormal condition of the mind[10] and self-defense based on mutual physical combat, Roxanne asserts that the court erred because it failed to consider fully those distinguishing factors that raised a reasonable doubt as to the existence of the required culpable state of mind. *See* 17-A M.R.S. § 38 (2015).  The flaw in her reasoning is that "merely because there is evidence sufficient to generate an issue does not mean that the [court] is compelled to believe that evidence."  *State v. Lagasse*, 410 A.2d 537, 542 (Me. 1980).

[¶33]   Our standard of review requires us to view evidence in the light most favorable to the court's judgment.  *See Jones*, 2012 ME 88, ¶ 7, 46 A.3d 1125.  Here, the court could rationally have found every element of knowing or intentional murder proven beyond a reasonable doubt despite evidence presented that could negate Roxanne's mental state.   First, evidence established that Rick was dead and that Roxanne was responsible for his death.

[¶34]   Second, regarding Roxanne's state of mind, the court found, and the record supports, that because Rick sustained so many injuries over what

---

[10]   "Evidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of the required culpable state of mind."  17-A M.R.S. § 38 (2015); *See State v. Graham*, 2015 ME 35, ¶ 17, 113 A.3d 1102.

must have been an extended period of time, "[t]he very nature of those injuries reflect a willfulness and a sense of purpose to inflict serious harm." The court also found that because Roxanne was emotionally hurt due to Rick's perceived infidelity, she "became enraged and formed an intention to hurt" him—an intention that she communicated to a neighbor. Finally, the record supports the court's finding that Roxanne's actions were taken knowingly. Rick was alive but incapacitated most of the time that the injuries were inflicted as demonstrated by the fact that the neighbors heard no voices or screams; that Rick was still bleeding and hemorrhaging from his injuries and was laying prone; and that Roxanne, an LPN, had sufficient medical knowledge to attend to his medical needs, and even a layperson would be aware that, if unattended, Rick would bleed to death from the injuries that she had inflicted.

[¶35]  Roxanne's contentions that, because she did not have a plan to kill Rick, because there was evidence of a mutual physical altercation,[11] and because she had several mental health diagnoses, she could not, and did not, have the requisite culpable state of mind to commit knowing or intentional murder are unavailing.  We conclude that sufficient evidence existed to permit

---

[11]  The court considered but ultimately rejected Roxanne's affirmative defense of self-defense, stating that there was no properly submitted evidence that generated the issue, and that her use of force, even if she was not the original aggressor, "exceeded the bounds of reasonableness."

a rational trier of fact to conclude beyond a reasonable doubt that Roxanne was guilty of knowing or intentional murder.

2. Depraved Indifference Murder Conviction

[¶36] Roxanne also contends that there was insufficient evidence to support a finding that she committed depraved indifference murder. We apply the same standard of review and examine the facts in the light most favorable to the court's judgment to determine whether a rational trier of fact could have found, beyond a reasonable doubt, that the State proved all of the elements of the charged offense. *See id.* ¶ 7.

[¶37] A defendant may be convicted of depraved indifference murder if the State proves beyond a reasonable doubt that (1) the conduct was voluntary, representing the defendant's conscious decision; (2) the conduct caused the victim's death; and (3) when looking objectively, the fact-finder is satisfied beyond a reasonable doubt that the conduct was, as the court here stated, so bad, brutal, savage, revolting or shocking, that, although the defendant may not have acted with the actual subjective intent to kill the victim, the fact-finder can nonetheless impute the highest degree of blameworthiness. *See State v. Thongsavanh*, 2007 ME 20, ¶ 39, 915 A.2d 421; *see also State v. Crocker*, 435 A.2d 58, 63 (Me. 1981) ("[D]eath-producing

conduct will justify a verdict of guilty of depraved indifference murder if a jury could find that [the] conduct was so heinous in the eyes of the law as to constitute murder." (quotation marks omitted)).

[¶38]  Citing *United States v. Harriss*, 347 U.S. 612, 617 (1954), Roxanne contends that, as a predicate to all criminal liability, the person must have fair notice that her conduct is forbidden, and, because she suffered from multiple mental health and medical diagnoses, she could not know that her behavior was proscribed.  She argues that it is inherent in this predicate that a person's individual capacities are always a factor when they so significantly and severely deviate from the norm.  Contrary to Roxanne's contention, *Harriss* establishes an objective standard and requires only that a statute give "a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute."  *Id.*; *see also State v. Flick*, 425 A.2d 167, 174 (Me. 1981).  No special dispensation for individuals diagnosed with mental health conditions exists in our case law to alter the objective standard we have enunciated, and Roxanne cites none in her brief.  Roxanne also argues that the existence of several mental health diagnoses raises more than a reasonable doubt as to her ability to form the requisite intent; however "[t]he

offense does not require evidence of a defendant's subjective state of mind." *Thongsavanh*, 2007 ME 20, ¶ 38, 915 A.2d 421.

[¶39] Regarding the sufficiency of the evidence, the record supports the court's finding that Roxanne acted with depraved indifference to human life. Her violence against her husband lasted for several hours, and the litany of the injuries he sustained as recited by the medical examiner, including a fractured hyoid bone, a sliced-open eyeball, and punctured scrotal sac, would lead a rational fact-finder to conclude that Roxanne's conduct was so outrageous and revolting as to constitute depraved indifference murder. *See id.* ¶ 39 (stating that "[c]onduct manifests a depraved indifference to the value of human life when it is highly charged with death-inducing potential and demonstrates a total lack of concern that a person may die or suffer as a result of the conduct").

B.    Not Guilty by Reason of Insanity

[¶40] Roxanne contends next that the court erred by concluding that she failed to prove, by a preponderance of the evidence, that she is not guilty by reason of insanity. *See* 17-A M.R.S. § 39. "We review the evidence, and any reasonable inferences that may be drawn from it, most favorably to the result reached by the trial court." *State v. Gurney*, 2012 ME 14, ¶ 44, 36 A.3d 893.

[¶41] "A defendant is not criminally responsible by reason of insanity if, at the time of the criminal conduct, as a result of mental disease or defect, the defendant lacked substantial capacity to appreciate the wrongfulness of the criminal conduct. Mental disease or defect means only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality." *Id.* ¶ 45 (alterations omitted) (quotation marks omitted) (citations omitted); *see* 17-A M.R.S. § 39. The defendant must prove this affirmative defense by a preponderance of the evidence, and we will overturn a trial court's finding adverse to the defendant "only if the record compels a contrary conclusion." *Gurney*, 2012 ME 14, ¶¶ 45-46, 36 A.3d 893 (quotation marks omitted).

[¶42] Roxanne contends that she has a severely abnormal mental condition due to her several documented diagnoses. The defense expert, Dr. Doiron, testified that he diagnosed Roxanne with "cognitive disorder, not otherwise specified" resulting from her brain surgery, schizoaffective disorder, and severe post-traumatic stress disorder. He stated that Roxanne would have been "overwhelmed" and "unable to properly understand what is taking place" in an altercation with her husband. She also may have developed a "fractionated sense of self" from abuse she suffered early in her

life and may have been in and out of a dissociative state. Dr. Doiron stated that he did not believe that Roxanne was able to appreciate the wrongfulness of her actions.

[¶43]  The State's rebuttal witness, Dr. O'Grady, testified that she had diagnosed Roxanne with post-traumatic stress disorder, "cognitive disorder, not otherwise specified," and personality change due to general medical condition, but she disagreed with Dr. Doiron's diagnosis of a psychotic disorder.  Dr. O'Grady did not believe that Roxanne was in the severe dissociative state required to negate criminal responsibility because Roxanne could not have made phone calls, engaged in coherent conversation, or quickly adjusted her behavior from one moment to the next if she had been in that state.  Dr. O'Grady agreed that Roxanne had a "thought dysfunction" and a lack of impulse control but noted evidence of malingering in another doctor's reports.

[¶44]  Although the court heard differing diagnoses and opinions concerning Roxanne's ability to perceive the situation the night of Rick's death,[12] on appellate review "[a]ny conflicts in evidence are resolved in favor of the State." *State v. Allen*, 2006 ME 20, ¶ 26, 892 A.2d 447.  The evidence in

---

[12] Roxanne at all times denied having hallucinations, delusions, or paranoia to Dr. Doiron.

the record supports the court's finding that "[a]lthough it is clear that [Roxanne] suffers from a variety of mental health issues, she has failed to prove that at the time of her actions, she lacked substantial capacity to appreciate the wrongfulness of her conduct." For example, the court noted that during the night of June 12, 2011, Roxanne was coherent in her several conversations with the neighbors, and neither neighbor suggested that she seemed out of touch. She was also able to fabricate a story when she called Rick's supervisor to tell him that Rick would not be coming in to work. She could communicate coherently with a dispatcher, the Bangor police officer, the nurse, and her neighbor on the morning of June 13, 2011. Roxanne was also able to damage Rick's motorcycle and make several phone calls, indicating that she was capable of reality-based, goal-directed behavior. Evidence that she appreciated the wrongfulness of her conduct included her refusal to allow her neighbor to call an ambulance, opening the door "a crack" when her other neighbor came over in response to a particularly loud noise, her lies to Rick's supervisor, and her efforts to clean the bathroom and do the laundry. The court found that these actions were intended to hide and deceive, which reflected an appreciation of wrongful behavior and a consciousness of guilt.

[¶45] Roxanne's actions and statements amply support the court's findings and conclusion that she failed to prove that she was not guilty by reason of insanity. *See Gurney*, 2012 ME 14, ¶ 43 & n.7, 36 A.3d 893. On this record, we discern no error in the court's determination that Roxanne did not meet her burden of proof on her affirmative defenses.

C.    Manslaughter

[¶46] Roxanne argues that the court erred by not considering the "lesser included" charge of manslaughter because her mental health diagnoses raise a reasonable doubt as to the existence of the culpable state of mind required for a murder conviction. We review the court's application of a statute de novo. *See Efstathiou v. Aspinquid, Inc.*, 2008 ME 145, ¶ 57, 956 A.2d 110. Title 17-A M.R.S. § 201(1-A) (2015) provides that "when the crime of depraved indifference murder is charged, the crime of criminally negligent manslaughter is deemed to be charged." "A person is guilty of manslaughter if that person . . . with criminal negligence, causes the death of another human being[.]" *State v. Tomah*, 1999 ME 109, ¶ 15, 736 A.2d 1047 (alterations in original) (quotation marks omitted).

[¶47] The court here acknowledged that a depraved indifference charge included the lesser charge of manslaughter and explicitly rejected it,

stating "[t]his is not a case of criminally negligent manslaughter. The evidence in this case is so compelling that it permits no other conclusion and proves beyond a reasonable doubt that [Roxanne] is guilty of depraved indifference murder." *See* 17-A M.R.S. § 13-A(1) (2015) (providing that the court, as fact-finder, need not consider a lesser included offense "unless on the basis of the evidence there is a rational basis for finding the defendant guilty of that lesser included offense"). Roxanne has no constitutional entitlement to consideration of the lesser included offense once the court finds beyond a reasonable doubt that her conduct was sufficiently dangerous as to reflect a depraved indifference to the value of human life. *See Boyce v. Comm'r Me. Dep't. of Corr.,* 217 F. Supp. 2d 108, 118 (D. Me. 2002); *see also Thongsavanh*, 2007 ME 20, ¶¶ 32-33, 915 A.2d 421.

[¶48] Because there was sufficient evidence in the record to support the court's conclusion that the State had proven, beyond a reasonable doubt, that Roxanne committed depraved indifference murder, the court did not err in finding there was no rational basis for finding Roxanne guilty of the lesser offense of manslaughter.

D.    Motion for New Trial

[¶49]  Roxanne contends that the court abused its discretion by denying her motion for a new trial.  "We review the denial of a motion for a new trial for clear error or an abuse of discretion."[13]  *State v. Robinson*, 2016 ME 24, ¶ 24, 134 A.3d 828.  Former Maine Rule of Criminal Procedure 33,[14] in effect at the time, permitted a court to grant a new trial if required in the interest of justice.  Roxanne moved for a new trial on the grounds that (1) the court erred in denying her request for a third competency hearing because she was demonstrating an active psychotic disorder, which constituted a bona fide doubt regarding her competency and, (2) because her mental health status has improved following the administration of antipsychotic medication, allowing her to proceed untreated during trial was substantially unfair and deprived her of due process of law.

[¶50]  "Competence to stand trial sufficient to meet the requirements of due process means that the accused is capable of understanding the nature and object of the charges and proceedings against him . . . and of conducting in

---

[13] "Review for an abuse of discretion involves resolution of three questions: (1) are factual findings, if any, supported by the record according to the clear error standard; (2) did the court understand the law applicable to its exercise of discretion; and (3) given all the facts and applying the appropriate law, was the court's weighing of the applicable facts and choices within the bounds of reasonableness." *Pettinelli v. Yost*, 2007 ME 121, ¶ 11, 930 A.2d 1074.

[14] Maine R. Crim. P. 33 (amended 2015, current version at M.R.U. Crim. P. 33).

cooperation with his counsel his defense in a rational and reasonable manner." *Thursby v. State*, 223 A.2d 61, 66 (Me. 1966). A defendant may be mentally competent to stand trial even though he or she may require psychiatric treatment. *Id.* at 68; *see also Drope v. Missouri*, 420 U.S. 162, 180 (1966) (stating that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required . . . .").

[¶51]  Dr. O'Grady with the State Forensic Service first evaluated Roxanne in November 2011 over the course of two sessions, totaling five and a half hours. Dr. O'Grady wrote an addendum to her report in June 2012 following receipt of Dr. Riley's evaluation, and she conducted follow-up evaluations in May 2012 and April and December 2013. Dr. Lorenz interviewed Roxanne in October and November 2011, in March 2012, and in December 2013. Dr. Doiron evaluated Roxanne in five separate sessions in February and March 2012 and November 2013. Finally, Dr. Riley conducted evaluations of Roxanne in June 2012 and March and December 2013. Additionally, prison staff and counselors regularly made inquiries and notations as to Roxanne's affect and state of mind during her confinement. The court held two separate, multiple-day, testimonial competency hearings

in March and December 2013, the second hearing being held just days before her trial was scheduled to begin. The record demonstrates that Roxanne's mental health was well monitored and regularly assessed over the course of the several years her case was pending and during the trial itself.

[¶52] In denying Roxanne's motion for a new trial, filed in June 2014, the court noted that three of the four experts examining her never observed any evidence of active psychosis and that "none of the transport officers, general jail staff members making progress notations[15] and in particular jail mental health workers ever observed any evidence of psychosis." Roxanne also indicated concern during the trial regarding the media's video recording of the proceeding, demonstrating her awareness of courtroom activity and ability to advocate for her needs. Additionally, following the extended recess during trial to give Roxanne time to decide whether she wanted to testify, the court engaged in a careful colloquy with her regarding her wishes, and at no time did she demonstrate psychosis; rather, she answered the court's questions in an appropriate and rational manner.

---

[15] A corrections officer stated in an interview in June 2014 that Roxanne's behavior was "much different when her defense attorneys came to visit her. . . . She would become more withdrawn, child-like and frail in demeanor . . . [but] after the attorneys left . . . she'd be back to the old Roxanne, with an age-appropriate voice and demeanor."

[¶53]  As to the improvement in her mental health status resulting from being prescribed anti-psychotic medication, in its order denying her motion for a new trial, the court observed that it was "aware of no recognized right for a criminal defendant to be at some specified state of optimum physical or mental health before being required to stand trial."  "Requiring that a criminal defendant be competent has a modest aim:  It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel.  While psychiatrists and scholars may find it useful to classify various kinds and degrees of competence . . . the Due Process Clause does not impose [that] additional requirement[]."  *Godinez v. Moran*, 509 U.S. 389, 402 (1993).

[¶54]  Given the discrepancies in Roxanne's presentation of symptoms among experts and jail staff, the consistent monitoring of her mental health status, and two judicial determinations of competency for trial, the trial court did not abuse its discretion by denying Roxanne's motion for a new trial.  She was not deprived of her due process right because there was sufficient evidence to support the court's findings that she was, and continued to be, competent to stand trial; and the court's weighing of the facts and choices was within the bounds of reasonableness.  *See Pettinelli v. Yost*, 2007 ME 121, ¶ 11, 930 A.2d 1074.

## III. CONCLUSION

[¶55]   In summary, we conclude that the court did not err in determining that the State proved beyond a reasonable doubt every element of both knowing or intentional murder and depraved indifference murder. We also conclude that the court did not err in determining that her defense of not guilty by reason of insanity was not supported by the evidence.   We also conclude that the court properly declined to consider whether Roxanne was guilty, instead, of the lesser offense of manslaughter because there was no rational basis for finding she was guilty of that offense.   Finally, the court did not abuse its discretion in denying Roxanne's motion for a new trial despite her allegedly improved psychological state.

The entry is:

> Judgment affirmed.

---

**On the briefs:**

> Joseph M. Baldacci, Esq., Law Office of Joseph M. Baldacci, Bangor, and David Bate, Esq., Bangor, for appellant Roxanne Jeskey

> Janet T. Mills, Attorney General and Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Joseph M. Baldacci, Esq., for appellant Roxanne Jeskey

Donald W. Macomber, Asst. Atty. Gen., for appellant State of Maine

Penobscot Unified Criminal Docket docket number CR-2011-2195
FOR CLERK REFERENCE ONLY